Filed 5/5/14

# IN THE SUPREME COURT OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, ) | |
| ) | |
| Plaintiff and Respondent, ) | |
| ) | S101984 |
| v. ) | |
| ) | |
| CALVIN DION CHISM, ) | |
| ) | Los Angeles County |
| Defendant and Appellant. ) | Super. Ct. No. NA043605 |
| _____ ) | |

A jury convicted defendant Calvin Dion Chism of the first degree murder (Pen. Code, § 187, subd. (a) (count one))[1] and attempted robbery (§§ 211/664 (count two)) of Richard Moon, and the second degree robbery of Jung Ja Chung (§ 211 (count three)).[2]  The jury found true the special circumstance allegation that the murder was committed during the attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)).  It also found true allegations that a principal in counts one and two was armed with a firearm (former § 12022, subd. (a)(1)), and that defendant personally used a firearm in the commission of all three counts, (former § 12022.5, former subd. (a)(1), now subd. (a)).  The trial court found true the allegation that defendant had suffered one prior serious or violent juvenile

---

[1]     All statutory references are to the Penal Code unless otherwise specified.
[2]     Marcus Johnson and Samuel Taylor were tried with defendant for their involvement in the murder and attempted robbery of Moon.  Each was convicted of first degree murder with an attempted robbery special circumstance, and each was sentenced to life in prison without possibility of parole.

adjudication within the meaning of the "Three Strikes Law" (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

The jury was unable to reach a penalty verdict, and the trial court declared a mistrial.  Another jury was impaneled.  After a retrial of the penalty phase trial, the second jury returned a verdict of death as to count one.

The trial court denied defendant's motion for new trial (§ 1181) and his motion to modify the penalty verdict (§ 190.4, subd. (e)).  With regard to count one, the trial court sentenced defendant to death plus a consecutive upper term of 10 years for the personal use of a firearm enhancement.  The court sentenced defendant to an upper term of six years on count two, plus a consecutive term of five years for the personal use of a firearm enhancement, but the court stayed this 11-year sentence pursuant to section 654.  The court then imposed a consecutive upper term of five years on count three, doubled to 10 years under the Three Strikes Law, plus a 10-year consecutive sentence for the personal use of a firearm enhancement.  Defendant was awarded 643 days of presentence custody credits.  This appeal is automatic.

We conclude defendant is entitled to 96 days of  conduct credit (§ 2933.1, subd. (c)), and order the clerk of the superior court to modify the abstract of judgment to reflect those 96 days of conduct credit.  The judgment, including the death sentence, is otherwise affirmed.

## I. FACTS

### A.  Guilt Phase

#### 1.  Prosecution Evidence

##### a.  Riteway Robbery

On May 18, 1997, defendant entered the Riteway Market (Riteway or market) in Compton alone and asked the lone clerk, Jung Ja Chung, for hair gel.

2

Chung said she did not have any, and defendant left. Defendant quickly returned with codefendant Johnson and three accomplices. One accomplice approached Chung, pointed his gun at her, and demanded money. Defendant went behind the counter and told Chung to open the cash register. Defendant took cash from the register and a nine-millimeter Glock handgun (the Glock) that the owner kept under the counter. The other robbers took various items. Defendant pointed the Glock at Chung as he followed his accomplices out of the store.

At trial, defendant's California Youth Authority (CYA) parole officer, Kenneth Lipkin, viewed the Riteway surveillance videotape of the robbery and recognized defendant as the person who first entered the market and later pointed the Glock at Chung as he left. Lipkin recognized defendant's voice on the tape saying, "We're in the house. They don't have a video," "There's a Glock," and "187." Lipkin noted that defendant's "187" comment was a reference to the Penal Code section that defines murder.

### b. Eddie's Liquor Store

#### (1) The Murder and Attempted Robbery

On June 12, 1997,[3] Edward Snow owned Eddie's Liquor (Eddie's or liquor store), which was located at the intersection of East Artesia Boulevard and Butler Avenue in Long Beach. Richard Moon was employed at Eddie's as a clerk.

Codefendant Johnson's sister Marcia[4] was acquainted with defendant and Taylor.[5] Around 9:00 a.m. on June 12, defendant, Johnson, Taylor, and Marcia

---

[3] All calendar references are to 1997 unless otherwise noted.

[4] Codefendant Johnson, his sister, and an unrelated witness share the same last name. To simplify our discussion of the facts and the law, we shall refer to codefendant Johnson as Johnson, and we refer to Johnson's sister Marcia and witness Stephanie Johnson by first name.

[5] Marcia testified pursuant to a plea agreement with the Los Angeles County District Attorney's Office that provided she would serve a 12-year sentence for her

3

met at Marcia's home in Compton. Defendant wore black jeans and a black T-shirt with the word "Air" and a white Nike logo printed across the front (Nike Air T-shirt). Defendant had a Glock handgun in his waistband, the same gun Marcia had seen him carrying "all the time" during the previous month. Defendant told them about his plan to rob Eddie's and assigned each person a task. He instructed Marcia to enter Eddie's to determine the location of any surveillance video cameras and the number of clerks. Defendant appointed Taylor to be the driver, and directed Johnson to go into the store with defendant. No one objected to defendant's plan.

Approximately 15 minutes later, the group left Marcia's house in a light gray Plymouth Voyager van Taylor had borrowed from his girlfriend, Zonita Wallace.[6] Defendant had the Glock tucked in his waistband when he entered the van. Around 2:00 p.m., Taylor parked a couple of blocks away from Eddie's. Marcia exited, walked to the liquor store and went inside. She saw a camera, and she saw a clerk standing behind the counter. Marcia purchased candy, returned to the van, and told defendant what she had seen. Defendant and Johnson then walked towards the liquor store. Defendant had a bulge in his waistband. Within a minute or two, there were one or two gunshots, and defendant and Johnson then ran from the liquor store to the van. Taylor drove the group to a house in Long Beach to meet Iris Johnston. The drive took 20 to 30 minutes. The group stayed at the house for about 10 minutes. They then left with Johnston and a friend and drove to defendant's residence.

---

involvement in the crimes that occurred at Eddie's in exchange for her truthful testimony.

[6] Wallace testified she loaned the van to Taylor in June 1997, but she did not recall the date. She said she was truthful when she spoke with Detective Reynolds on June 19. Reynolds testified Wallace told him she loaned the van to Taylor at about 1:30 p.m. on June 12, and that he returned it at about 4:30 p.m. that same day.

Steven Miller had been sitting on a bus bench across the street from Eddie's on June 12 when he saw two African-American men enter the liquor store.[7] Shortly thereafter, Miller heard a popping sound he thought was a gunshot. He then saw the same men run from the store. They ran north on Butler Avenue approximately two blocks and turned right onto East Marker Lane. Miller immediately ran into Eddie's and saw Moon under the counter on his back, unconscious and bleeding. Miller telephoned the police. He described the two African-American males as 17 to 18 years old, five feet and seven or eight inches tall, with short "Afro style" hair and "thin builds." Miller added that one wore dark jeans and a black shirt with white stripes on the front.

Stephanie Johnson heard gunshots as she drove near the intersection of Artesia Boulevard and Butler Avenue between 2:00 and 3:00 p.m. on June 12. She then saw two men running from the direction of the liquor store. One was dark-skinned, slim, and of medium height. He was wearing dark khaki pants and a black shirt with a white shirt underneath, and his hair was curly on top and shaved around the bottom. Stephanie could not describe the second person or recall his clothing.

During the afternoon of June 12, Peter Motta was driving on East Marker Lane when he saw a light-colored Plymouth Voyager, the same make and model as Wallace's, parked near the intersection of East Marker Lane and Butler Avenue. Two African-Americans were inside, one in the driver's seat, the other in the passenger seat. Two men ran very fast from Butler Avenue towards the van and

---

[7]    Miller refused to testify at trial. His observations and statements regarding the attempted robbery and murder at Eddie's were admitted over a defense objection through the testimony of the police officer who interviewed him shortly after Moon was murdered.

then "disappear[ed]." Motta noticed one was African-American, thin, and slightly taller than average.

(2)  Events Immediately Following the Crimes at Eddie's

Long Beach Police Officers Rudy Romero and Stacey Holdredge arrived at Eddie's at 2:08 p.m. While Romero spoke with Miller outside, Holdredge went inside and found Moon lying on the floor behind the counter, bleeding and unconscious. Moon died before the paramedics arrived.

Iris Johnston was acquainted with defendant, Johnson, Taylor, and Marcia. The group met Johnston at the Long Beach home of one of her friends between 1:00 and 1:30 p.m. the day Moon was killed. Johnston testified they arrived in a van similar in make and model to Wallace's van. After about 10 minutes, Johnston and the group left in that van and drove to defendant's residence. Along the way, Johnston saw helicopters overhead and asked what happened. Someone said, "There must have been a robbery." Defendant said "I" or "we" "know [who] did it." Inside defendant's residence, they watched the news on television. They then walked to a store. Defendant appeared nervous when they saw a police car. Later, while defendant, Marcia, and Johnston were on a three-way telephone call, defendant told Johnston he wanted to talk privately with Marcia. That evening, Johnston wrote and hand delivered a letter to defendant in which she accused him and the others of having committed "that little robbery in Long Beach."

### (3)  Investigation

Police recovered a bullet from the floor near Moon's hip and a spent nine-millimeter cartridge casing on the floor near the liquor shelves. There was an indentation in the ice cream machine in the store, which was consistent with the type of mark caused by a bullet ricocheting off a hard item. The owner of Eddie's testified there was no indentation on the ice cream machine prior to June 12, and

nothing was missing from the cash register. Police retrieved a videotape from a videocassette recorder (VCR) inside the liquor store (videotape; or liquor store or surveillance videotape).

Los Angeles County deputy medical examiner Stephen Scholtz performed an autopsy on Moon's body and determined the cause of death was a gunshot to Moon's back. The bullet had exited through Moon's chest. Moon's right knee was scuffed, and his scalp was bruised. Scholtz examined Moon's shirt visually and microscopically but observed no residue or soot. Scholtz examined Moon's entire body but found no stippling, which is the marking of skin by powered particles discharged from a firearm.

### (4) Search of Defendant's Residence

On June 19, one week after Moon was murdered, defendant's parole officer and Compton police searched defendant's residence. They found a loaded Glock handgun on his bedroom closet shelf, a black T-shirt with "Air" and a white Nike symbol printed across the front, and a letter Johnston had written to defendant dated June 12. Defendant was arrested the same day.

### (5) Search of Johnston's Residence

On August 20, police searched Johnston's home and recovered a letter defendant had written to her that was postmarked August 11.

### (6) Firearms Evidence

Riteway's owner identified the loaded Glock handgun found in defendant's bedroom closet as the gun that had been kept under the counter at Riteway. He testified that the Glock had been under the counter on the day of the Riteway robbery.

Robert Hawkins, a Los Angeles County Sheriff's Department crime laboratory firearm examiner, examined and test fired the Glock, and he examined

the bullet and cartridge casing recovered from the floor at Eddie's. Hawkins testified the bullet could have been fired from the Glock, but he could not be certain because there were not enough markings on it. Based on markings on the cartridge casing, Hawkins concluded the casing had been fired from the Glock. Hawkins examined photographs taken of Eddie's ice cream machine, and concluded the indentation on its outer metal surface could have been caused by a bullet strike. Hawkins used a chemical process on Moon's shirt that revealed two gunpowder particles, each of which was within three and a half inches of the center of the entry hole on the back of the shirt. Based on those measurements, Hawkins concluded the gun was approximately four to five feet from Moon when it was fired.

### (7) *Physical Appearance of Defendant and Johnson*

On June 12, defendant, an African-American, was five feet nine inches tall and weighed 152 pounds. On June 20, Johnson, an African-American, was six feet tall and weighed 150 pounds.

### 2. *Defense Evidence*

Defense investigator Daniel Mendoza testified that there was a doorway but no door between defendant's bedroom and an adjacent spare bedroom that could be accessed through the back door of the house.

Michael Cayton, a Long Beach Harbor Patrol officer, testified as a witness for Johnson. Between 12:00 and 3:00 p.m. on June 12, Cayton was off duty and driving near Eddie's when he noticed three "suspicious" men standing near a parking lot. Cayton noticed the men were dark skinned, in their early 20's, and between five feet nine inches and six feet one inch in height. One walked toward Eddie's, one followed, and one stayed outside looking around. Two of the men

entered the liquor store.  Cayton could not identify or exclude defendant, Johnson, or Taylor as any of the three men he saw that day.

## B.  Penalty Phase

### 1.  Prosecution Evidence

At the penalty phase retrial before a new jury, the prosecutor presented evidence similar to that presented during the guilt phase, evidence of prior crimes committed by defendant, and victim impact testimony.

On December 9, 1993, Cheryl Quadrelli-Jones, an assistant principal at Anaheim's Gilbert West High School, saw defendant leave the school and cross the street towards a pedestrian pass-through that led to a nearby neighborhood. Approximately 100 feet from defendant, a male appeared from another pass-through.  Defendant extended his arm and fired a gun at that individual.  As Quadrelli-Jones yelled to students to get down, defendant and the male he had shot at left the area.

On January 31, 1994, defendant and two male companions approached Bradley Turner in a parking lot at Cypress's Arnold Park.  Defendant held a gun to Turner's head.  One companion demanded Turner's wallet and then searched for it in Turner's car.  Not finding the wallet, he said to the others, "Just kill the mother fucker right now."  Defendant and Turner then struggled, and defendant shot Turner in the leg.  Rhonda Griffin, who was nearby, saw defendant fleeing and tried to chase him.  She was within an arm's length of defendant when he pressed a gun against her temple and said, "Do you want some of this, you fucking bitch?" A car filled with several other people drove up, and defendant jumped in. Defendant was subsequently arrested.  On July 25, 1994, defendant admitted allegations in a juvenile petition that he committed the attempted second degree robbery of Turner and assaulted Turner with a semiautomatic firearm.

The victim impact evidence included testimony from family members and friends regarding victim Moon's personality, his joy of life, and the effect his death had on those close to him. It also included a photo board with several photographs of Moon with members of his family. We provide a detailed summary of this testimony and physical evidence in conjunction with our discussion of defendant's contention that the trial court erred by admitting much of the victim impact testimony.

### 2. Defense Evidence

Defendant's mother and father were 13 and 15 years old, respectively, when defendant was born. Defendant's mother had six children with five different men. She was a drug abuser, and she lost custody of defendant when he was seven years old. Until then, defendant had been a "happy" child.

Defendant then lived with his paternal grandmother. When defendant was 10 years old, his father was killed, and defendant had to identify the body. After that, defendant began having behavioral problems. His paternal grandmother gave custody of defendant to his maternal grandmother, who took defendant to therapy sessions at a church once a week for about a year. Defendant graduated from high school in 1996 during his CYA commitment.

Arthur Gray, a senior pastor at Abundant Joy Christian Fellowship in Inglewood, knew defendant in his early childhood. Defendant had attended church and participated in many church activities, including the choir. Defendant was always pleasant, courteous, and friendly.

Chaplain Robert Curry met defendant at the Paso Robles CYA facility in about 1995. Defendant always was willing to work, even without compensation. He sang in the choir, preached, acted as a peer counselor, and inspired others. Defendant helped to reduce racial tensions within his unit.

Deandre Brown testified that, while defendant was a ward at the Paso Robles CYA, he inspired Brown to believe in God and in himself. Defendant encouraged Brown to attend high school classes.

Lorraine Wahlberb, a volunteer at the Paso Robles CYA, met defendant in 1996. She was involved in many activities with defendant. He spoke during church services and participated in church activities. Defendant often preached at classes offered at the institution and positively influenced others.

In 1997, Lawrence Mills met defendant while teaching him at the Chino CYA. In 1998, defendant was returned to CYA upon violation of his parole for his involvement in the instant crimes. Mills testified that defendant earned a training certificate in operating a forklift and another certificate in warehousing.

Defendant testified about his mother losing custody of him, his father's death, and having to identify his father's body. He added that, while living with his paternal grandmother, he twice was sexually assaulted by a neighbor, whom he did not identify. At age 11, defendant started to use drugs and alcohol. Later, he became interested in religion. While at various CYA facilities, defendant became religious and experienced a spiritual awakening.

Defendant denied any involvement in the instant crimes. He said his grandmothers had taught him the difference between right and wrong, and he told the jury, "A lot of the crimes and stuff, I'm pretty much guilty of . . . , a murderer, I'm not. I value the human life too much for me to kill a man over a dollar." Addressing the victim's wife, defendant said "every time I see you, hearing the spark that your daughter said that you had in your eyes, I got to go to . . . my cell, every night and think about how your life was before Mr. Moon died. And if I was to say anything, it wouldn't be sorry. It would be I wish I could change the hands of time. I wish I could bring him back. But I can't."

11

## II. DISCUSSION

### A. Jury Selection Issues

#### 1. *Group Death-qualification Voir Dire*

Defendant contends the trial court erred in failing to conduct the death-qualifying portion of voir dire of potential jurors individually and in sequestration as required by *Hovey v. Superior Court* (1980) 28 Cal.3d 1. He asserts violations of his federal constitutional rights to due process under the Fifth and Fourteenth Amendments, to a trial by an impartial jury under the Sixth Amendment, and to reliable guilt and penalty verdicts under the Eighth Amendment.

We have noted that *Hovey* held "prospective jurors in capital cases should be sequestered and questioned individually regarding their views on the death penalty. In 1990, the voters adopted Proposition 115, which as relevant here, abrogated *Hovey* by adding to the Code of Civil Procedure a provision stating that 'where practicable, [voir dire shall] occur in the presence of the other [prospective] jurors in all criminal cases, including death penalty cases.' (Code Civ. Proc., § 223.)" (*People v. Tafoya* (2007) 42 Cal.4th 147, 167.) We have consistently held individual voir dire is not constitutionally required following passage of Proposition 115. (See, e.g., *People v. Thomas* (2012) 53 Cal.4th 771, 789; *People v. Brasure* (2008) 42 Cal.4th 1037, 1050-1051.) We decline defendant's request to reconsider our prior holdings.

#### 2. *Constitutionality of Death qualification Voir Dire*

Defendant contends his death judgment must be reversed because the death qualification portion of jury selection is unconstitutional. The high court and this court have rejected this contention. (*Lockhart v. McCree* (1986) 476 U.S. 162, 176-177; *People v. Lenart* (2004) 32 Cal.4th 1107, 1120.) Defendant offers no

persuasive reason to reconsider the issue as to our state constitution, and we decline to do so.

## B. Guilt Phase Issues

### 1. Steven Miller's Statements

Defendant contends the trial court erred in admitting the portion of Officer Romero's testimony that related the statements Steven Miller made outside of Eddie's shortly after the murder. Defendant claims admission of Miller's statements violated his Sixth Amendment right to confrontation.

### a. Factual and Procedural Background

Over a defense hearsay objection, Officer Romero testified as follows regarding his encounter with Miller outside Eddie's.

Officer Romero arrived at Eddie's within seven minutes of the 911 radio broadcast. Miller was the first person he contacted. Miller appeared to be "very nervous," "unsettled," and "very uneasy and shaken up" throughout the encounter. Miller said, "I think he's dead." Miller told Officer Romero the following. Miller had been sitting on a bus bench across the street from the liquor store when he saw two African-American males go inside. Shortly afterward, Miller heard a popping sound he recognized as a gunshot. Miller then saw the same men run from Eddie's, head north on Butler Avenue, and turn right onto East Marker Lane. Miller immediately ran into Eddie's, looked behind the counter, and saw the clerk on his back, unconscious and bleeding. Miller called the police. In addition, Miller told Officer Romero both males appeared to be 17 or 18 years old, five feet and seven or eight inches tall, with short "Afro style" hair and "thin builds." One wore dark jeans and a black shirt with white stripes on the front. The second wore long dark shorts.

13

Romero radioed for police assistance.  Meanwhile, Officer Holdredge, Romero's partner, had entered Eddie's to check on the clerk.  After finding him on the floor, Holdredge called for paramedics and additional police assistance.

Before the prosecution called Miller to the stand, counsel for Miller informed the court that Miller was in custody awaiting trial in an unrelated Three Strikes case and that Miller intended to invoke his Fifth Amendment right against self-incrimination if called to testify.  During a hearing on the matter, the parties indicated they were unaware of any information that would suggest Miller would incriminate himself if he testified in this case.  Based on representations by counsel that they would not try to impeach Miller based on his prior criminal record, the trial court ruled Miller did not have a right to assert the Fifth Amendment privilege, and advised Miller of this ruling.  However, when the prosecution called Miller as a witness, Miller refused to answer any questions.  The court found Miller in contempt and unavailable to testify.

### b. Discussion

Evidence Code section 1200, subdivision (a), provides that " '[h]earsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  Hearsay evidence is not admissible "[e]xcept as provided by law."  (*Id*., subd. (b).)  Miller's statements were hearsay because they were made out of court and were offered for the truth of what he had told Officer Romero.  Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶]  (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and  [¶]  (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  Defendant concedes Miller's statements qualified for admission

14

under this exception to the hearsay rule, but relying on the high court's decision in *Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*), he contends the statements were not admissible under the confrontation clause of the Sixth Amendment.

*Crawford* held the confrontation clause "prohibits 'admission of *testimonial* statements of . . . witness[es] who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' (*Crawford*, [541 U.S.] at pp. 53-54, italics added.)" (*People v. Romero* (2008) 44 Cal.4th 386, 421 (*Romero*).)**8** Thereafter, as we noted in *Romero*, in *Davis v. Washington* (2006) 547 U.S. 813, the high court explained that " '[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " (*Romero*, *supra*, 44 Cal.4th at p. 421.) After *Crawford*, the high court has emphasized that " 'not all those questioned by the police are witnesses' for purposes of the Sixth Amendment and not all ' "interrogations by law enforcement officers" [citation], are subject to the Confrontation Clause.' ([*Michigan v.*] *Bryant* [(2011) 562] U.S. __ , __ ,131 S.Ct. [1143,] 1153, quoting *Crawford*,

_____

**8** Although *Crawford* was decided after defendant's trial, while his appeal was pending, the high court's ruling applies retroactively to his case. (*People v. Cage* (2007) 40 Cal.4th 965, 975 fn. 4.) Moreover, because defendant's counsel could not have anticipated *Crawford's* sweeping changes to federal confrontation clause case law, he did not forfeit this claim by failing to object to the admission of Miller's statements on federal constitutional grounds. (*People v. Pearson* (2013) 56 Cal.4th 393, 461-462.)

15

*supra*, 541 U.S. at p. 53.)" (*People v. Blacksher* (2011) 52 Cal.4th 769, 811 (*Blacksher*).)

Based on the reasoning in *Bryant*, in *Blacksher* we identified six factors to consider in determining whether statements made in the course of police questioning were for the " 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause." (*Blacksher*, *supra*, 52 Cal.4th at p. 813.) These are (1) an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved in the encounter; (2) whether the statements were made during an ongoing emergency or under circumstances that reasonably appeared to present an emergency, or were obtained for purposes other than for use by the prosecution at trial; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation had shifted from addressing an ongoing emergency to obtaining evidence for trial; and (6) the informality of the statement and the circumstances under which it was obtained. (*Id.* at pp. 814-815.)

Applying *Crawford* to defendant's case, we conclude that Miller's statements to Officer Romero were nontestimonial and that their admission did not violate defendant's Sixth Amendment right to confrontation. Officer Romero was the first officer to arrive at the scene, and Miller was the first person he contacted. Miller appeared to be very nervous and "shaken up." The circumstances of the encounter, which took place outside a store where a shooting had recently occurred, reveal that Miller and Officer Romero spoke to each other in order to deal with an ongoing emergency. It was objectively reasonable for Officer Romero to believe the suspects, one of whom presumably was still armed with a gun, remained at large and posed an immediate threat to officers responding to the shooting and the public. We are convinced that Miller's additional statements

16

concerning his observations and descriptions of the suspects were made for the primary purpose of meeting an ongoing emergency and not to produce evidence for use at a later trial. (See *Romero*, *supra*, 44 Cal.4th at p. 422 [statements made by an agitated victim of an ax attack were provided to police for the purpose of addressing an emergency situation and determining whether the attacker remained at large and presented a threat to others].)

### 2. *Evidence that Wallace was Fearful of Testifying*

Defendant contends the trial court erroneously admitted evidence that three years prior to trial, either Johnson or his cousin accused Zonita Wallace of talking with police, contending it was irrelevant. Defendant also claims the evidence was unduly prejudicial under Evidence Code section 352, because the jury could infer his consciousness of guilt based on evidence of his association with Johnson and Johnson's connection to the accusation.[9]

---

[9] Here, and in most other claims, defendant contends the asserted error violated various of his state and federal constitutional rights. "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

17

### a. Factual and Procedural Background

Wallace testified she dated Taylor in 1996 and 1997 and was acquainted with defendant and Johnson. On the day Moon was murdered, Wallace owned a gray Plymouth Voyager van that had two front doors and one sliding side door. Wallace had loaned the van to Taylor in June 1997 but did not recall the date.

Wallace further testified that she drove her van with Compton Police Detective Catherine Chavers on June 19 after her interview with Sergeant Frederick Reynolds but did not recall that she and Chavers drove to a gas station. Wallace denied that while at the gas station with Chavers, she met someone whom she identified as Johnson. She also denied that something occurred at the gas station that caused her to be afraid.

Over a hearsay objection by Johnson's counsel, Sergeant Reynolds testified that during the June 19 interview, Wallace said she had loaned Taylor the van the week before. Reynolds testified that after the interview, he drove to a gas station where he saw Chavers with Wallace, and that Wallace appeared to be frightened. Without explaining why, Wallace said she would not go to court because she was afraid. The trial court ruled Reynolds's testimony was admissible to explain Wallace's failure to recall driving with Chavers to the gas station, to explain Wallace's denials that she had identified Johnson and become frightened by something that occurred at the gas station, and to demonstrate Johnson's consciousness of guilt.

The prosecutor then made an offer of proof that Detective Chavers would testify she rode with Wallace to a gas station in Compton on June 19, that Wallace identified Johnson and his cousin Michael as the two males inside a vehicle parked at that location, that Wallace talked with the two males while Chavers waited in the van, that Chavers overheard one of the males accuse Wallace of having spoken

18

with the police, and that Wallace denied the accusation but thereafter appeared to be "frightened."

The prosecutor argued evidence of the accusation was admissible to show Wallace was fearful of testifying and to demonstrate Johnson's consciousness of guilt. Counsel for Johnson argued that the evidence should be excluded because Wallace was not asked on direct examination whether she was afraid to testify. Also, the evidence assertedly was unduly prejudicial because there was no showing that *Johnson* made the accusation. Defendant's counsel did not join in these objections.

The trial court overruled Johnson's objections and admitted evidence of the accusation on the grounds asserted by the prosecutor. Thereafter, Detective Chavers testified consistent with the prosecution's offer of proof that Wallace identified Johnson and his cousin at the gas station, that one of the males said, "[Wallace] had spoken to the police," and that Wallace then appeared to be frightened.

### b. Discussion

Preliminarily, the People argue defendant forfeited this issue because he did not join in Johnson's objections. "A litigant need not object, however, if doing so would be futile." (*People v. Wilson* (2008) 44 Cal.4th 758, 793.) Here, because defendant had no reasonable basis to present additional information that might have altered the trial court's ruling or to object that the ruling would have caused him unique prejudice, he could have reasonably believed making his own motion would have been futile. We consider this contention on its merits and find no error.

We review a trial court's rulings on the admission and exclusion of evidence for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113

19

(*Guerra*).) "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869 (*Burgener*); see generally Evid. Code, § 780.) Evidence of any explanation of the basis for such fear is likewise relevant to the jury's assessment of the witness's credibility and admissible for that nonhearsay purpose, but not for the truth of any matters asserted. (*Burgener*, at p. 869.)

Evidence that Johnson or his companion accused Wallace of speaking with the police was relevant because the jury reasonably could infer that the accusation was made to persuade Wallace not to cooperate with police or testify at a trial involving the liquor store incident. The jury also reasonably could infer that the accusation frightened Wallace and affected her testimony. Here, where Wallace "professed inability to remember her previous statements [and gave] equivocal responses to many of the prosecutor's questions, . . . the trial court did not abuse its discretion in determining that evidence of her fear in testifying was relevant to the jury's assessment of her credibility." (*People v. Valdez* (2012) 55 Cal.4th 82, 137.)

Defendant's claim to the contrary, the accusation was admissible although it occurred more than three years before Wallace testified. Wallace's testimony was riddled with claimed memory failures and evasive and inconsistent responses, many of which related to events that occurred the day the accusation was made. Wallace's professed inability to remember her prior statements and her equivocal responses could be explained by her fear of retaliation for testifying and that fear could have reasonably originated from the accusation Detective Chavers overheard.

We conclude the accusation was admissible against defendant notwithstanding the lack of evidence linking the statement to him. "For such

20

evidence to be admissible, there is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is 'directly linked' to the defendant." (*Guerra*, *supra*, 37 Cal.4th at p. 1142.) Because "[i]t is not necessarily the source of the threat — but its existence — that is relevant to the witness's credibility" (*Burgener*, *supra*, 29 Cal.4th at p. 870), the evidence similarly was not excludable on the ground that Chavers was unable to discern whether Johnson or his cousin made the accusation.

Citing Evidence Code section 352, defendant next contends admission of evidence of the accusation to show Johnson's consciousness of guilt was unduly prejudicial to him because the testimony implied his consciousness of guilt although no evidence connected him to the accusation. Defendant, however, did not object to the evidence on this specific ground at trial, did not join in Johnson's objection on this ground, and did not request a limiting instruction on the ground that the evidence was admissible as to Johnson but not him. The issue is therefore forfeited. (See Evid. Code, §§ 353, subd. (a) [an objection to the assertedly erroneous admission of evidence must be timely and specific], 355 [when evidence is admissible for one purpose and inadmissible for another, "the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"].) Because such a specific objection could have prevented the asserted prejudice and nothing suggests it would have been futile for defendant to object on this specific ground in the trial court, this claim is forfeited on appeal. (*People v. Duran* (1976) 16 Cal.3d 282, 289; *People v. Wilson*, *supra*, 44 Cal.4th at p. 793.)

Even if this claim were preserved, it has no merit. Neither the evidence nor the prosecutor suggested the accusation was evidence of defendant's consciousness of guilt. Defendant's speculation that the jury might have

connected the evidence to him does not establish that the trial court abused its discretion in admitting evidence of the accusation.

### 3. *Marcia Johnson's Statements to Detective Edwards*

Defendant contends the trial court erroneously permitted Detective Paul Edwards to testify that during his interview with Marcia, Marcia said that the night before the murder, defendant had told her he had been to the liquor store before and saw only one clerk inside, an old man. This claim is without merit.

### a. *Factual and Procedural Background*

On direct examination, Marcia testified that when she met with defendant, Johnson, and Taylor at her home the morning of the murder, defendant told the group about his plans to rob Eddie's. He said he wanted Marcia to go inside, look for cameras, and determine how many clerks were working. Defendant said Taylor would drive, and Johnson would enter the liquor store with defendant. Only defendant spoke, and no one objected. Marcia testified she had not been to the liquor store or heard of it before that morning.

During cross-examination, defendant's counsel asked about specific discrepancies in Marcia's statements to Detective Edwards regarding the planning of the robbery. Marcia testified she initially told Edwards that she, Johnson and Taylor "scoped out" the liquor store on the morning of the crimes. Asked whether she had mentioned to Edwards that defendant was involved, Marcia admitted she did not include defendant in that version of the events. Counsel asked whether Edwards told Marcia he did not believe her, and had suggested the planning had occurred the night before. Marcia testified Edwards did so, and that she then told Edwards the group met the night before but had not discussed a plan to rob the liquor store at that time. Counsel then asked whether she recalled telling Edwards that during the night meeting, defendant "came to me and told me that he needed

22

me to do something and he needed me to go to the store and go buy, go check out and see how many people was in there and to buy something. He said he needed the money. He was going to rob a liquor store." Marcia then testified she recalled telling Edwards this, but testified the conversation did not relate to any plans to rob Eddie's.

Thereafter, Detective Edwards testified that when he interviewed Marcia, she initially told him that on the morning of the crimes, she, Taylor, and Johnson drove to the liquor store in a brown Cutlass. After Edwards said he did not believe her, Marcia told Edwards defendant accompanied them to the store and that they drove there in Wallace's van. After Edwards said he believed the planning had occurred the night before, Marcia agreed and told Edwards the foursome met at her house the night before. She added that defendant said he had been to the store on a prior occasion and saw only one clerk, an old man, inside.

Defendant's counsel objected that Marcia's statement that defendant had said he had previously been to the store was inadmissible hearsay, but the trial court ruled the statement was admissible to impeach Marcia's testimony and for its truth under the prior inconsistent statements exception to the hearsay rule. The court reasoned the statement was inconsistent with Marcia's direct testimony because Marcia did not mention it when the prosecutor asked about the statements defendant had made when he discussed his plans to rob the liquor store. The court then informed the parties that, although it had excused Marcia from giving further testimony, it would permit counsel to recall her to give her an opportunity to explain or deny the statement, as required under Evidence Code section 770. Marcia was not recalled to testify.

### b. Discussion

"A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219.)[10] Defendant contends Marcia's statement to Detective Edwards regarding what defendant told her about his prior visit to the liquor store was not admissible as a prior inconsistent statement because the prosecutor did not question Marcia specifically regarding whether defendant had previously been there. We need not decide the correctness of the trial court's ruling as to whether this particular statement of Marcia's was inconsistent with her trial testimony on that point. Marcia impliedly acknowledged to Edwards that she had heard of the liquor store the night before the murder when she told Edwards the group met that night and defendant told them he had gone to the store on a prior occasion and observed the lone clerk. On direct examination, however, Marcia denied she had "ever heard of Eddie's Liquor Store before [the morning of the crimes]." In effect, Marcia's prior statement to Edwards was inconsistent with that testimony as to *when* she first heard of Eddie's and therefore was admissible under Evidence Code section 1235.[11] (See *People v. Cowan* (2010) 50 Cal.4th

---

[10]   Section 1235 of the Evidence Code provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

[11]   Marcia's hearsay statement to Edwards consisted of double hearsay because it also included an out-of-court statement by defendant offered for its truth. Defendant's statement was admissible because it qualified under the hearsay exception for a party admission (Evid. Code, § 1220). (See *People v. Williams*

24

401, 462 [test for whether a witness's prior statement is inconsistent with prior testimony is whether the statement is inconsistent in effect rather than an express contradiction of terms].) Accordingly, we conclude the trial court did not abuse its discretion in admitting Marcia's statements to Detective Edwards.[12]

### 4. Adoptive Admission

Defendant contends testimony regarding a letter Iris Johnston wrote to defendant was erroneously admitted under the hearsay exception for adoptive admissions. (Evid. Code, § 1221.) Defendant also claims the Compton Police Department violated his due process rights and right to present a defense by failing to preserve his letter to Johnston in violation of *California v. Trombetta* (1984) 467 U.S. 479, 485-490 (*Trombetta*).

### a. Factual and Procedural Background

Over defendant's objection, Iris Johnston testified she hand delivered a letter to defendant the evening of the murder in which she accused him of committing a robbery at the liquor store. A redacted version of her letter that omitted express or implied references to Johnson and Taylor was admitted into evidence. The redacted letter read as follows: "6-12-97 [¶] Dear Dein, [¶] What's up? Nothing much this way, just chillin in my room being bored, I want to tell you a little something! First of all I wanted to say I have a little idea that you guys did that little robbery in Long Beach, because ya'll ran to the T.V. to watch the news and than when ya'll seen the helicopters ya'll was like, 'yeah, we know the [guys] that did that. So I had a little ideal that ya'll did something and than when we was walking home ya'll was getting all nervous when a police car would

---

(1997) 16 Cal.4th 153, 199, fn. 3 [multiple hearsay is admissible provided that each hearsay level falls within a hearsay exception].)

[12] Although our theory of admissibility differs from that of the trial court, "we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 595, 582.)

pass by.  Another idea I have is when we was on the phone together watching the news, you was all telling me to talk, until they showed that part about the robbery. I was like hello, you was like 'you can't talk while I'm watching the news.  I was saying to my self they must of did it, that's why I got off the phone with you.  And then when we was on the phone (Marcia, me, you) and ya'll was like ya'll need to tell each other something and ya'll didn't want me to hear.  [¶]  Will all I am trying to say is that I don't want us going any further than what we already are, because if we go to gether and you get caught doing what ever the fuck you be doing, I'm just going to be ass out!  Will just get back at me whenever! . . . P.S. Don't be afriad  to tell me something! [¶]  Much [heart symbol], [¶] Iris."

Defendant did not read the letter in Johnston's presence.  There is no evidence that he responded to it or discussed it with Johnston.  Johnston did not speak with defendant until several years later, within months of her testimony at trial.  During the search of defendant's residence one week after the shooting, police found the letter on his bedroom dresser.

Sergeant Reynolds testified that while searching Johnston's home on August 20, police found a handwritten letter from defendant to Johnston dated August 11.  Reynolds booked defendant's letter into evidence at the Compton Police Department but did not note its contents in any report.  Reynolds testified he was unable to locate defendant's letter because it was apparently misplaced when the Compton Police Department moved its evidence storage to a Los Angeles County Sheriff's Department facility.

The prosecutor sought to admit Johnston's letter as an implied admission by defendant that he had committed the attempted robbery because he failed to respond to that letter.  Defense counsel objected that there was no foundation for admitting Johnston's letter because there was no evidence defendant had read it, and, alternatively, that the letter was inadmissible because defendant may have

26

denied Johnston's accusation in his letter that law enforcement lost. The trial court admitted Johnston's letter into evidence, reasoning it was sufficiently accusatory to prompt a response from defendant and that none had been given. The court rejected as speculative the assertion by defendant's counsel that defendant may have denied the accusation in his letter to Johnston.

### b. Johnston's Accusation

"[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception [citation] and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto . . . .' [Citation.] We review the trial court's conclusions regarding foundational facts for substantial evidence. [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

Johnston's letter constituted hearsay because the prosecution offered it as an out-of-court statement to prove that defendant did admit that he committed "that little robbery in Long Beach." (Evid. Code, § 1200.) The prosecutor sought admission of Johnston's letter under the adoptive admission hearsay exception. In support of that theory of admissibility, the prosecution introduced evidence that Johnston delivered her letter to defendant shortly after the crimes occurred, its contents were accusatory, defendant did not respond to Johnston's letter, that letter was found in his bedroom a week after Johnston delivered it, and he wrote a letter to Johnston two months later.

" 'Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.' (Evid. Code, § 1221.) Under this provision, '[i]f a person is accused of having committed a crime, under circumstances which fairly afford

27

him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

While the letter was plainly accusatory and would call for a response if the accusations were untrue and were known to defendant, there is no evidence of the circumstances under which defendant read the letter, if he had done so, and there is no evidence of defendant's reaction upon reading it. There was no showing that, by words or conduct, defendant manifested his adoption of, or belief in, the contents of Johnston's letter. Defendant's mere possession of it is insufficient to satisfy this requirement. (See, e.g., *People v. Lewis* (2008) 43 Cal.4th 415, 499 [evidence of the defendant's possession of drawings that purportedly bore his nickname and indicated he identified with the Penal Code section for robbery and considered himself a menace to society was insufficient to support a finding that he manifested a belief in what the drawings depicted].) We conclude the trial court erred in admitting Johnston's letter under the adoptive admissions hearsay exception. Additionally, because there was no properly admitted evidence of an adoptive admission, the trial court erred in instructing the jury on adoptive admissions under CALJIC No. 2.71.5.

Defendant argues his death judgment should be reversed because the prosecutor assertedly exploited the error in admitting the evidence during argument by stressing the evidence was critical to the People's case whether it was considered for its substance as an implied admission by defendant or as proof of what occurred. Also, the error assertedly reduced the prosecution's burden of proof of all elements of the capital charges in violation of his constitutional rights

28

by "filling in holes in [its] case — the identity of the perpetrators and corroboration of Marcia Johnson's testimony."

We find the argument unpersuasive. As explained below, we are satisfied the jury reasonably did not consider the contents of the letter for their truth. Also, the court instructed the jury that statements made by counsel are not evidence. (CALJIC No. 1.02.) Therefore, the erroneous admission of the evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76 [erroneous admission of evidence at the guilt phase is reviewed under *Watson* standard].) In addition, because the letter lacked substantive value, its erroneous admission had no impact on the prosecution's burden of proof, and therefore the error was not of constitutional dimension.

Defendant nonetheless contends that the error and prejudice in the admission of Johnston's letter as an adoptive admission was exacerbated by the trial court's error in instructing the jury with CALJIC No. 2.71.5. Assertedly, the instructional error reduced the prosecution's burden of proof, in violation of his constitutional rights to due process, trial by an impartial jury, and a reliable death verdict.

CALJIC No. 2.71.5 as given informed the jury that "[i]f you should find from the evidence that there was an occasion when a defendant: one, under conditions which reasonably afforded him an opportunity to reply; two, failed to make a denial in the face of an accusation expressed directly to him, or in his presence charging him with the crime for which this defendant now is on trial, or tending to connect him with this commission, and; three, that he heard the accusation and understood its nature, then the circumstance of his silence on that occasion may be considered against him as indicating an admission that the accusation thus made was true. [¶] Evidence of an accusatory statement is not

29

received for the purpose of proving its truth, but only as it supplies meaning to a silence of the accused in the face of it. [¶] Unless you find that a defendant's silence at the time indicated an admission that the accusatory statement was true, you must entirely disregard his statement."

Under this instruction, the jury could consider evidence of the letter to infer an admission by defendant that Johnston's accusations were true only if it found preliminarily that defendant read her letter, understood its contents to be an accusation that he committed the liquor store robbery, and was reasonably afforded an opportunity to deny the accusation but failed to do so. As discussed above, we concluded the evidence was insufficient to establish these predicate facts. In addition, the jury was instructed under CALJIC No. 17.31 to disregard an instruction that applies to facts determined not to exist. We presume the jury followed the instructions it was given. (*Guerra*, *supra*, 37 Cal.4th at p. 1115.) Under these circumstances, the jury reasonably accorded no weight to the evidence. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1127 ["In analyzing the prejudicial effect of error, . . . an appellate court does not *assume* an unreasonable jury."].) Moreover, because the instruction had no application to the facts alleged in the letter, defendant's claim that the instructional error reduced the prosecution's burden of proof is without merit. For these reasons, we conclude the error in instructing the jury under CALJIC No. 2.71.5 was harmless. (*Watson*, *supra*, 46 Cal.2d at p. 836; see *People v. Beltran* (2013) 56 Cal.4th 935, 955 [" ' "[m]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *Watson* ' "].)

*c. Loss of Defendant's Letter to Johnston*

Defendant contends that law enforcement committed prejudicial error in failing to disclose to the defense the contents of defendant's letter to Johnston and that law enforcement's subsequent loss or destruction of his letter violated his rights to present a defense and to due process pursuant *Arizona v. Youngblood* (1988) 488 U.S. 51, 58, and *Trombetta*, *supra*, 467 U.S. at pages 488-489.

" ' "Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence 'that might be expected to play a significant role in the suspect's defense.' [Citations.] To fall within the scope of this duty, the evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' [Citations.] The state's responsibility is further limited when the defendant's challenge is to 'the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' [Citation.] In such case, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " ' " (*People v. Farnam* (2002) 28 Cal.4th 107, 166.)

Defendant did not raise this issue in the trial court. His due process claim under *Trombetta* is of a type that requires a trial court to consider additional facts and apply a legal standard different than that applied in ruling on a hearsay objection. (See *People v. Boyer*, *supra*, 38 Cal.4th at p. 441, fn. 17.) Therefore, the trial court's ruling that Johnston's letter was admissible as an adoptive admission would not have necessarily led to a rejection of the claim that defendant was denied due process of law because law enforcement had misplaced his letter to Johnston. (*Ibid*.) Accordingly, we conclude defendant's *Trombetta* claim is

31

forfeited because defendant failed to raise the issue below.  (*People v. Duran*, *supra*, 16 Cal.3d at p. 289.)

In any event, the claim is without merit.  Defendant has not shown that his letter had " 'an exculpatory value that was apparent before the evidence was destroyed [or lost].' "  (*People v Pastor Cruz* (1993) 16 Cal.App.4th 322, 325.) Assuming defendant's letter to Johnston potentially was useful to his defense, nothing in the record suggests it was lost due to bad faith on the part of law enforcement, and its absence "did not deny defendant all opportunity 'to obtain comparable evidence by other reasonably available means.' "  (*People v. Thomas* (2012) 54 Cal.4th 908, 929, quoting *Trombetta*, *supra*, 467 U.S at p. 489.) Defendant was able to cross-examine Johnston on the issue and, had he chosen to do so, he could have testified to the nature of his letter to Johnston.  "There is no constitutional infirmity in the circumstance that if defendant had wanted to expand on the information presented by [the contents of Johnston's letter,] and . . . by testifying himself, he might have been put in the position of choosing between his right to testify at the trial and his right to remain silent.  ' " 'The criminal process . . . is replete with situations requiring the "making of difficult judgments" as to which course to follow.  [Citation.]  Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.' " [Citations.]'  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 153.)"  (*Thomas*, *supra*, 54 Cal.4th at p. 929, fn. 5.)

### 5. Accomplice Corroboration

The trial court instructed the jury that Marcia was an accomplice as a matter of law.  Defendant contends his first degree murder and attempted robbery convictions and the attempted robbery felony-murder special-circumstance finding

must be reversed because they were based on Marcia's uncorroborated testimony. The contention is without merit.

Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." " 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' [Citation.] The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303.)

Marcia testified as follows. On the morning of the crimes, defendant arrived at her house wearing a black and white Nike Air T-shirt and black jeans, with a Glock tucked in the waistband. Defendant articulated his plan to rob the liquor store to Marcia, Johnson, and Taylor and assigned each a task. Marcia identified Wallace's van as the one Taylor used to drive them. Defendant had the Glock in his waistband when he left the house and entered the van. Taylor parked a couple of blocks from the store. Marcia got out and walked to the store. Once inside, she looked around, bought some candy, and returned to the van. Marcia informed defendant that inside the store there were two cameras and one clerk. She got in the van, and defendant and Johnson got out. Defendant had a bulge in his waistband as he walked with Johnson toward the liquor store. After she heard a gunshot, she watched as defendant and Johnson ran to the van. They both reentered the van. Taylor then drove to a house in Long Beach where the group met Johnston.

Marcia's testimony was sufficiently corroborated by other evidence connecting defendant to the attempted robbery and the murder at Eddie's. Defendant stole the murder weapon during the Riteway robbery, and the loaded

33

murder weapon was found in defendant's bedroom closet one week after the murder. Eddie's surveillance videotape shows two African-American men entering and leaving the liquor store at the time of the crime, and defendant is African-American. One of the men wore a black T-shirt with a large white Air Nike logo on the front, and police found a similar shirt in defendant's bedroom one week after the crimes. Additionally, evidence that defendant participated in the robbery of the Riteway clerk in which a gun was used reasonably supports an inference that defendant intended to rob the clerk working at Eddie's when defendant shot him with the Glock stolen from Riteway.

We conclude the record contains more than ample evidence that corroborates Marcia's testimony and supports defendant's convictions for first degree murder and attempted robbery, as well as for the attempted robbery felony-murder special-circumstance finding. Even if, as defendant asserts, section 1111 creates a "liberty interest" under *Hicks v. Oklahoma* (1980) 447 U.S. 343, his federal constitutional right to due process were not violated based on uncorroborated testimony of an accomplice.

### 6. *Still Photographs from the Liquor Store Videotape*

Defendant contends that the trial court erred prejudicially in admitting two still photographs that were printed from the liquor store videotape using equipment at Aerospace Corporation (Aerospace). Assertedly, the photographs were enhanced and the prosecution failed to lay a proper foundation. The contention is without merit.

#### a. *Factual background*

Officer Holdredge testified that she arrived at Eddie's within minutes after the shooting, that she viewed the surveillance videotape police obtained at the crime scene, and that it accurately portrayed what occurred when she, Officer

34

Romero, and Miller were inside the store. Long Beach Police Sergeant Jorge Cisneros testified that he viewed the videotape at the police station and identified People's exhibits Nos. 43A and 43B as the two still photographs that were printed from the videotape using equipment at the police station. He explained that the heads and necks of the subjects shown on the film were not visible on the still prints because the VCR "did not display the entire picture on the film," that is, the "top and bottom" portions of the film (i.e., margins) were not visible.

Sergeant Cisneros went to Aerospace and requested that still photographs be printed from the videotape. He remained at Aerospace and watched one of its employees insert the videotape in a VCR that was connected to a computer, a monitor, and a printer. Cisneros described the Aerospace monitor as having a larger screen than the one used at the police station to view the videotape. According to Cisneros, when the videotape was played, "the picture of what was on that video tape did appear on the computer screen" and it showed "the full length of the film on the VCR," including the images recorded in the margins of the film. He pointed to the frames he wanted printed, and the employee printed the stills (People's exhibits Nos. 41 and 42). Cisneros testified that the difference between the images that were shown on the photographs printed using the equipment at the police station and those shown on the photographs printed using the Aerospace equipment was that the latter showed defendant's and Johnson's heads and necks, whereas the former did not. Cisneros said that Aerospace personnel informed him that "they could not do any enhancements to the video. [B]ut we did get, like I said, we could see more of the film, I believe because of the [equipment] we were using." Cisneros did not "ask that any of the action [on the videotape] be altered." In ruling the evidence was admissible, the trial court found that "Aerospace equipment [could] show the whole frame, [that] the Long

35

Beach Police Department [could] only show a portion," and that the photographs had not been enhanced.

### b. Discussion

"No photograph or film has any value in the absence of a proper foundation. It is necessary to know when it was taken and that it is accurate and truly represents what it purports to show. It becomes probative only upon the assumption that it is relevant and accurate." (*People v. Bowley* (1963) 59 Cal.2d 855, 862 (*Bowley*).) The general rule is that a photograph is admissible upon a showing that it accurately depicts what it purportedly shows. (*Ibid*; see Evid. Code, §§ 250 [a photograph is a "writing"], 1400 ["Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law."].) "This is usually shown by the testimony of the one who took the picture. However, this is not necessary and it is well settled that the showing may be made by the testimony of anyone who knows that the picture correctly depicts what it purports to represent." (*People v. Doggett* (1948) 83 Cal.App.2d 405, 409; see *Bowley*, *supra*, 59 Cal.2d at pp. 860-861 [citing *Doggett* with approval].)

Evidence Code section 1553, subdivision (a), establishes a rebuttable presumption that "[a] printed representation of images stored on a video or digital medium is presumed to be an accurate representation of the images it purports to represent." The presumption affects the burden of proof and is rebutted by a showing that the "printed representation of images stored on [the] video or digital medium is inaccurate or unreliable." (*Ibid*.) The burden then shifts to the proponent of the printed representation to prove by a preponderance of evidence that it accurately represents the existence and content of the images on the video or

digital medium. (*Ibid*.) If the proponent of the evidence fails to carry his burden of showing the printed representation accurately depicts what it purportedly shows, the evidence is inadmissible for lack of adequate foundation. (*Bowley*, *supra*, 59 Cal.2d at pp. 860-861.)

Once properly authenticated and admitted into evidence, a photograph may be used as demonstrative evidence to support a witness's testimony or as probative evidence of what is shown. (*Bowley*, *supra*, 59 Cal.2d at pp. 860-861.) A trial court's ruling on the admissibility of evidence of photographs will not be disturbed on appeal absent an abuse of discretion. (*People v. Rountree* (2013) 56 Cal.4th 823, 852.)

Here, the still photographs were properly authenticated and admitted into evidence. Officer Holdredge viewed the videotape police retrieved from the VCR at the crime scene and testified it accurately depicted her conduct and that of Officer Romero and Miller inside the store immediately after the shooting. Thus, the videotape was shown to be an accurate representation of what it purported to be, a recording of the events that occurred inside Eddie's at or near the time of the shooting.

In addition, Sergeant Cisneros testified that that the still photographs printed at Aerospace depicted the images stored on the videotape that Officer Holdredge authenticated. He explained that the Aerospace photographs depicted the suspects' heads and necks because the company's equipment could print the portion of the recorded images stored in the margins of the videotape, whereas the equipment used at the police station could not. Under these circumstances, we conclude the prosecution established that the photographs printed at Aerospace depicted the images recorded on the videotape, and therefore were presumed to be accurate representations of those images. (Evid. Code, § 1553.) Defendant's mere speculation that the photographs were manipulated or enhanced could not rebut

37

this presumption. For these reasons, we conclude the photographs were adequately authenticated, and the trial court did not abuse its discretion in admitting them.

### 7. Evidence of the Riteway Robbery

Defendant claims the trial court committed prejudicial error when, despite defendant's willingness to plead guilty to the Riteway robbery and stipulate he obtained the gun used in the capital crime in that robbery, the court cross-admitted evidence of the Riteway robbery to prove defendant was guilty of the charged attempted robbery and murder at Eddie's. Defendant alternatively claims the trial court prejudicially erred in failing to give its promised limiting instruction on the other crimes evidence.

### a. Factual and Procedural Background

Before any evidence was introduced, the prosecutor made a motion to permit the jury to consider evidence of the Riteway robbery on the capital charges. She argued the evidence was relevant to show defendant, Johnson, and Taylor acted pursuant to a common plan or scheme and entered Eddie's with the intent to rob. Defendant offered to plead guilty to the Riteway robbery and to stipulate he obtained the gun used in the capital crime in that robbery. Defendant's plea offer was conditioned on the trial court finding that the Riteway robbery evidence was not admissible under Evidence Code section 1101, subdivision (b). Counsel further argued any evidence regarding the Riteway robbery other than the fact of a guilty plea to that robbery charge and a stipulation about the gun would be inadmissible because it would be unduly prejudicial under Evidence Code section 352.

The court granted the prosecutor's motion, ruling that evidence of the Riteway robbery was relevant to prove intent and knowledge with regard to the

38

capital charges under section (b) of Evidence Code section 1101, and that the evidence was not unduly prejudicial within the meaning of Evidence Code section 352.  In response to that ruling, defendant withdrew his plea offer, and the trial court informed the parties that it would give an instruction as to defendant and Johnson on the purposes for which the jury could and could not consider the Riteway robbery evidence with regard to the liquor store charges.  Prior to deliberations, the court gave a limiting instruction only as to Johnson that informed the jury it could consider the evidence on the issues of intent, identity, common plan, and knowledge.

### b.  Discussion

We first consider whether the trial court erred in admitting the Riteway robbery evidence to prove defendant's involvement in the liquor stores crimes.

"Unless evidence is admitted for a limited purpose, or against a specific party, evidence admitted at trial may generally be considered for any purpose.  A corollary of this rule is that the jury is free to apply its *factual* findings on one count in deciding any other count to which those facts are relevant."  (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1170, fn. omitted.)  "One example of limited admissibility arises in the context of other crimes evidence.  Evidence of a person's *character*, also known as propensity evidence, is inadmissible to prove conduct in conformity with that character trait.  [Citations.]  This is the familiar ban on propensity evidence:  [Evidence of other crimes] generally cannot be admitted to prove the defendant is disposed to commit crimes.  [Evidence Code] [s]ection 1101 [, subdivision] (a) codifies this general rule.  Notwithstanding that rule, [Evidence Code] section 1101, subdivision (b) . . . clarifies that [other crimes evidence] can be admitted for *other* relevant purposes, such as proving motive,

39

opportunity, intent, and so on, but they may not be admitted to prove the defendant had a disposition to commit similar bad acts." (*Id.* at pp., 1170-1171, fn. omitted.)

"Evidence of *identity* is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2.) The admissibility of other crimes evidence for this purpose "turns on proof that the [incidents] share *sufficient distinctive common features* to raise an inference of identity." (*People v. Lindberg* (2008) 45 Cal.4th 1, 23, italics added.) We have often commented that " '[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.)

Here, the evidence established that defendant, an African-American male, stole a Glock handgun during the Riteway robbery, and that the same Glock was used to shoot and kill Moon at Eddie's one month after the Riteway robbery. The evidence further established that the same stolen Glock was found loaded in defendant's bedroom closet one week after the murder at Eddie's. The evidence also revealed that defendant mentioned the Penal Code section for murder (187) during the Riteway robbery, and that a murder at Eddie's was committed by an African-American man using the Glock stolen from Riteway. In light of the distinctive shared features between the crimes at Riteway and Eddie's related to the Glock handgun, evidence of the circumstances surrounding the Riteway robbery reasonably support the inference that the individual who committed the Riteway robbery and stole the Glock from Riteway is the same person who had a Glock tucked in his waistband hours before the murder at Eddie's, was one of the two perpetrators who used the stolen Glock to murder the clerk at Eddie's, and possessed the stolen loaded Glock in his bedroom soon after the murder.

Therefore, we conclude evidence related to the Riteway robbery evidence was relevant to the issue of identity with regard to the liquor store charges.

The Riteway robbery evidence also was relevant to the liquor store charges on the issue of intent. "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance. [Citations.]" (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 23.) " 'The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution.' [Citations.]" (*People v. Gallego* (1990) 52 Cal.3d 115, 171.)

Assuming defendant was one of the two individuals who planned and committed the acts that occurred at the liquor store on June 12, the fact that he committed the Riteway robbery was relevant to the issue of intent with regard to the attempted robbery charge connected with the liquor store murder. In both cases, an armed individual confronted a lone clerk behind the checkout counter of a small store during the daytime. Force was used against both clerks. The Glock stolen by defendant during the Riteway robbery was used by one of the perpetrators at the liquor store. Based on these similarities, evidence of the Riteway robbery would reasonably support an inference that defendant harbored the same intent to rob in each instance.

Having concluded evidence of the Riteway robbery was admissible on the issues of identity and intent on the liquor store charges,[13] we next address

---

[13] We need not discuss the correctness of the trial court's ruling that Rite Way robbery was also admissible on the liquor store charges on the issue of knowledge. Assuming any error in that regard, we note that " ' "a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976.) That is, because as we

41

defendant's claim that the prosecutor was required to accept his plea offer and stipulation regarding the gun he stole during the Riteway robbery.

"The general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.) The key factual disputes in this trial were whether defendant committed the crimes at the liquor store, and, if so, whether he acted with an intent to rob the liquor store's clerk. Defendant's plea offer and proposed stipulation regarding the Riteway robbery would not have included an admission on either of these issues. Had the facts of the Riteway robbery been withheld from the jury as the result of a stipulation, the prosecution would have been deprived of significant circumstantial evidence material to the liquor store crimes. There were no percipient witnesses to the liquor store crimes, the surveillance videotape only showed the suspects entering and exiting the liquor store, and apparently nothing had been taken from the store. Under these circumstances, evidence of the Riteway robbery was crucial for the prosecution in demonstrating that defendant and Johnson possessed a similar intent to rob the liquor store in a similar fashion, in order to prove the charge of attempted robbery. In *People v. Arias* (1996) 13 Cal.4th 92, we held that the prosecutor could not be compelled to accept defendant's offer to stipulate to charges stemming from a sexual assault where the prosecution would otherwise lose material circumstantial evidence relevant to the issues of identity and consciousness of guilt on charges stemming from a murder that occurred prior to the sexual assault. (*Id.* at pp. 130-131.) Here, as in *Arias*,

---

explain below, the trial court did not err in ruling the evidence was admissible on the issue of intent, its additional ruling that the evidence was admissible on the issue of knowledge is of no consequence.

42

the prosecution was not required to accept defendant's plea offer and proposed stipulation.

Defendant's claim to the contrary, the trial court did not abuse its discretion in denying defendant's motion to exclude the details of the Riteway robbery on the capital charges under Evidence Code section 352. The robbery and attempted robbery counts from the separate incidents were properly joined as alleging crimes of the same class (§ 954; *People v. Walker* (1988) 47 Cal.3d 605, 622), and the details of the manner in which the Riteway robbery was carried out were not likely to inflame the jury's passions because, as defendant's attorney acknowledged, the Riteway robbery was a "standard robbery."

We next address defendant's claim that the trial court committed prejudicial error by failing to instruct the jury that evidence admitted to prove the Riteway robbery could be not be considered to prove his propensity to commit the liquor store crimes. Although the trial court had informed the parties it would give a limiting instruction as to both Johnson and defendant, the court referred only to Johnson when it gave the limiting instruction prior to deliberations. Because the trial court was not obligated to provide a limiting instruction, defendant forfeited the issue by failing to request either a correction of the given instruction or a new instruction that applied specifically to the charges against defendant. (*People v. Freeman* (1994) 8 Cal.4th 450, 495.) In any event, any error in failing to give a limiting instruction as to defendant was harmless given the multiple permissible uses of the Riteway robbery evidence with regard to the liquor store charges, the absence of any argument by the prosecutor urging the jury to infer defendant's propensity to commit robberies, the presumption that the jurors followed the instructions regarding presumption of innocence and reasonable doubt, and the overwhelming evidence of defendant's guilt as to the liquor store charges.

43

*8. CALJIC No. 17.41.1*

Pursuant to CALJIC No. 17.41.1, the trial court instructed the jury that "[t]he integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case in this guilt phase based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation." Defendant contends this instruction infringed on his federal and state constitutional rights to trial by jury and his state constitutional right to a unanimous verdict. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.)

Although we disapproved use of this instruction in future trials in *People v. Engelman* (2002) 28 Cal.4th 436, we held that "the instruction does not infringe upon defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous verdict." (*Id*. at pp. 439-440.) Defendant provides no persuasive reason for us to reconsider our conclusion, nor does he cite anything in the record that indicates any juror refused to deliberate or expressed an intention to disregard the law or to decide the case on an improper basis. (See *People v. Brown* (2004) 33 Cal.4th 382, 393.) Accordingly, we reject this claim.

*9. Cumulative Error*

Defendant contends the cumulative effect of the asserted guilt phase errors requires reversal regardless of the prejudicial impact of any single error. To the extent there are instances in which we have found error or assumed its existence, we have concluded no prejudice resulted. We do not find reversible error by considering the claims cumulatively.

## C.  Penalty Phase Issues (Penalty Retrial)

### 1.  Batson/Wheeler

Defendant claims that at the penalty retrial, the trial court erroneously denied his two motions under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) based on the prosecutor's assertedly discriminatory use of peremptory challenges to remove African-American Prospective Jurors F. J. and J. S., in violation of his state constitutional right to trial by a jury drawn from a representative cross-section of the community (Cal. Const., art. I, § 16).  For the first time on appeal, defendant claims the erroneous denial of his *Wheeler* motions deprived him of his Fourteenth Amendment right to equal protection of the laws.  (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).)[14]  For the reasons we explain below, the trial court did not err in denying the *Batson/Wheeler* motions.[15]

### a.  Factual and Procedural Background

#### (1)  Prospective Jurors F.J. and J.S.

During general voir dire, the prospective jurors responded orally to questions posed by the trial court that were based on questions that appeared on a printed questionnaire, which was provided to all jurors.  Among other things, the jurors were asked to state their occupation, if any, and any prior occupation that was substantially different from their current employment.

Prospective Juror F.J. revealed that since graduating from high school he had been a driver with United Parcel Service (UPS) for 18 years.  He had never

---

[14]  Although the defendant cited only *Wheeler* when making his motions, on appeal a *Wheeler* motion is treated as a motion under *Wheeler* and *Batson*. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)  We refer to the defense motions as *Batson/Wheeler* motions throughout this opinion.

[15]  Because we find the trial court did not err by denying either of defendant's *Batson/Wheeler* motions, we reject defendant's boilerplate claims of violations of various other state and federal constitutional rights.  (See *People v. Roldan* (2005) 35 Cal.4th 646, 703; *People v. Yeoman*, *supra*, 31 Cal.4th at p. 118.)

held a supervisory position. He had prior jury experience in two criminal trials: a robbery case, which had proceeded to verdict, and a murder case, which had resulted in a hung jury. He had felt frustrated that the jurors could not reach a verdict.

Prospective Juror J.S. designed telephone circuits for Pacific Bell, her employer for 30 years. While she experienced career advancement and trained others in the use of computers and circuit designs for 20 years, she was never a supervisor. As a designer, she would get an order and put together the circuit. While in school and before her employment at Pacific Bell, J.S. worked at the "Department of Justice" or the "District Attorney's Office" "handling . . . transcripts and filing them." J.S. had prior jury service in a criminal and a civil trial, each of which reached a verdict. The criminal case concerned child molestation; the civil case involved personal injury. J.S. said she would express her opinions during deliberations and listen to her fellow jurors, but would not change her views just to accommodate the views of others.

### (2) Peremptory Challenges

Prospective Juror F.J.

After the prosecutor exercised her fourth peremptory challenge against Prospective Juror F.J., defense counsel objected the challenge was racially motivated, noting there remained only one or two African-Americans in the venire. The trial court responded that it "always feel[s] inadequate in these *Wheeler* motions. Now I'm supposed to put on a D.A. hat and look at my notes and see whether, in my opinion, a reasonable D.A. would have had a not racial reason for using a peremptory." The court noted that some district attorneys automatically exclude a prospective juror who had served on a hung jury. It found defendant failed to make a prima facie showing of group bias and offered the prosecutor the opportunity to place her reasons for the challenge on the record.

46

In response, the prosecutor noted that F.J. had "[n]o significant life experiences that indicates strong decisionmaking skills. He's been throughout his occupation, a UPS driver, never supervised anybody. There is nothing about his background that indicates that he can engage in a decision that — of this magnitude. There is . . . strength about his background; although, in a different type of case, I think he would be a wonderful juror, but this is a penalty where I'm going to be asking him to bring back a verdict of death. I want strong decision-making skills." The court then said its notes indicated "since high school UPS driver, loading, no supervisory experience, girlfriend sells computers, two minor children, plays golf, coaches a traveling basketball team." After the court denied the motion, the prosecutor added that the decision in the penalty phase of a death penalty case "is far more stressful and of greater magnitude than your ordinary case, and I bear that in mind when I excuse jurors."

Prospective Juror J.S.

Following Prospective Juror F.J.'s excusal, the parties exercised several more peremptory challenges. When the prosecutor challenged Prospective Juror J.S., counsel made his second *Batson/Wheeler* motion. He argued that "[t]here's only two or three left in the group in the audience. She seemed like an idea [*sic*] juror. She had two priors, both—one civil, one criminal. There was a verdict. She has worked for many, many, many years at Pacific Bell. Worked her way up. She supervised people. She trains. She obviously can make decisions. She worked—and just otherwise seems to be a good juror. I can't see any reason why the District Attorney would not accept her, other than the fact she is a black female. And I would note that the last jury which hung, the two hangs were black females. But that should not be a basis."

The trial court reminded counsel that the prosecutor had explained that she "relied on life's experience criteria" earlier in excusing Prospective Juror F.J. and

47

stated that it did not recall that Prospective Juror J.S. "supervised anybody." The trial court "believe[d] she [had] trained people on how to use the computer design circuits."

After the court invited the prosecutor to comment, she stated that "my recollection is that she specifically said she did not supervise anybody." The prosecutor felt J.S. had a "misleading" job description, that she "makes no decisions. She is given specifications and she inputs that information into a computer. She is basically a more sophisticated form of a filing clerk" and has "held nothing but clerk positions. She has trained individuals in terms of inputting data. She is a data entry specialist, basically. I don't think the fact she trains people in how they input data makes her specifically qualified for high-stress decision-making jobs. . . . This is going to be a very stressful, deliberative process [that] requires individuals who are seasoned decision makers. They could handle the stress of a tough decision. The fear factor involved any time you get a stressful and difficult decision to make, that can be very crippling in terms of the deliberation process when you get somebody in the jury room who doesn't have that experience. And that's one of . . . the many things that I look at in terms of a juror. I've looked at her job description. She has basically been in clerk positions. If I were to not kick her, it seems to me that it would only be because she is an African-American. And I don't believe that I'm going to discriminate in one direction or the other. I'm not going to keep her simply because she is African-American. . . . [T]here's absolutely nothing about her background that tells me that she can operate in a high-stress situation. And that's very important in this type of case where the issue is life and death."

The court found defendant had failed to make a prima facie case of racial discrimination but permitted counsel to further argue. Counsel argued J.S.'s life experiences, including her 30-year employment with Pacific Bell, employment at

48

the Department of Justice, and her 20-year experience at Pacific Bell training others in the use of computers and circuit designs provided her adequate experience to make difficult decisions, and thus she was qualified to sit as a capital juror.

The trial court clarified that J.S. had been a "filing clerk" with the Department of Justice and stated that regardless of whether it would have used the prosecutor's criteria to exercise peremptory challenges, it found significant that it was "a non-race based criteria. And her use of the peremptory as to this juror was consistent with that non-suspect category use."

The prosecutor was permitted to add to the record that "it's not just supervisory positions that I look for. I look for how they handled stressful situations or inciden[ts] in their life." She said she had to decide "whether or not an individual juror has what it takes to be fearless in the decision to handles the stress of the moment, and to engage in basically a deliberative process that involves a decision of an enormous magnitude." Noting she has limited things she can look at, and that voir dire is like a job interview, she concluded, "I don't believe that [J.S.] is up to the decision in this case."

The court said it was "confident the D.A. is not using a protected category basis for her peremptories" and gave the defense further opportunity to make a record. Defense counsel asked the court "may I inquire, this juror was asked whether or not she has ever had to deal with stress in her life, specifically?" The trial court stated that "[I] don't recall that specific question. [B]ut there were questions about her life." The prosecutor then objected, stating "how a person deals with stress and how they recognize it as stress will vary from individual to individual. I know what I go on; their ability to deal with stress is one of the things I look at, including their ability to make decisions. That includes processing information and experience in making decisions. It's my opinion that

more experienced people in terms of decision makers make better decisions for the appropriate reasons." The trial court denied the request to reopen voir dire and denied the *Batson/Wheeler* motion. At that time, the jury for the penalty retrial included 11 Caucasians and one African-American. The alternate jurors included two Caucasians, one African-American, and an individual who may have been Hispanic or Filipino.

### b. Discussion

The federal and state Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on impermissible group bias. (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) We conduct the three-step *Batson* inquiry to review claims of alleged group bias based on race. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional claims." (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*).)

In ruling on defendant's *Batson/Wheeler* motion concerning F.J.'s excusal, the court explicitly ruled that he failed to make a prima facie showing of discrimination. Then, after the prosecutor stated her reasons for excusing F.J, the trial court stated that "my notes, since high school UPS driver, loading, no supervisory experience, girlfriend sells computers, two minor children, plays golf, coaches a  traveling basketball team." In doing so, the trial court impliedly agreed

with the prosecutor that F.J. did not have supervisory experience and found the prosecutor's justification was genuine.

In denying defendant's *Batson*/*Wheeler* motion regarding J.S., the trial court stated that a "prima facie showing [of group bias] has not been made." It recalled that J.S. had experience training others at Pacific Bell "on how to use the computer design circuits" but not supervising employees. The court also expressly found that the prosecutor's justification was a "non-race based criteria" and that her excusal of J.S. was "consistent with that non-suspect category." Taken together, the court's statements evince its satisfaction that the prosecutor's explanations were genuine and credible.

Where the trial court determines that defendant did not make a prima facie showing of group bias and also rules on, indicates agreement or satisfaction with, or otherwise passes judgment on the ultimate question of purposeful discrimination, the case is described as a first stage/third stage *Batson*/*Wheeler* hybrid, and the question whether a defendant established a prima facie case of group bias is rendered moot. (*People v. Riccardi* (2012) 54 Cal.4th 758, 786 [question whether defendant established prima facie showing of purposeful discrimination rendered moot where "the court expressly agreed with the prosecutor's reasons, and thereafter appeared implicitly to agree with the prosecutor's reasons given in response to [the] defendant's subsequent *Wheeler* motions"]; *Lenix*, *supra*, 44 Cal.4th at p. 613, fn. 8, citing *Hernandez v. New York* (1991) 500 U.S. 352, 359; see *People v. Mills* (2010) 48 Cal.4th 158, 173-174 [question whether prima facie case of group bias has been made is mooted where the trial "passed judgment on the prosecutor's actual reasons for the peremptory challenges (the third stage of a *Batson* inquiry), expressly noting that the court was 'satisfied . . . from the explanation given by the prosecutor' that the motivation for the challenges was not based on race"].) Here, as indicated above, with respect to

51

each of defendant's *Batson/Wheeler* motions, the trial court ruled ultimately that the prosecutor's stated reasons were genuine and race neutral, and therefore, as to each motion, the question whether defendant made a prima facie showing of racial discrimination is rendered moot. Accordingly, " 'we express no opinion on whether defense counsel established a prima facie case of discrimination and instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons for dismissing [the] African–American prospective jurors.' " (*Riccardi*, *supra*, 54 Cal.4th at p. 787.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " (*Lenix*, *supra*, 44 Cal.4th at p. 613.) In reviewing a trial court's denial of a *Batson/Wheeler* motion, we examine "only whether substantial evidence supports its conclusions." (*Id.* at p. 613.) " 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 76.)

Defendant first contends we should not give the normal deference to the trial court's rulings because the trial court was biased. Defendant's claim to the contrary, the fact that in ruling on the *Batson/Wheeler* motion as to J.S., the trial court mentioned the reasons the prosecutor gave for her earlier decision to challenge F.J. does not, as defendant asserts, establish it abandoned its neutrality. We next consider whether substantial evidence supports the trial court's rulings

that the prosecutor provided plausible, race-neutral reasons for challenging F.J. and J.S.

### (1) Statistical Evidence

"If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." (*Hernandez v. New York* (1991) 500 U.S. 352, 363 (plur. opn. of Kennedy, J.).) Defendant contends statistical evidence demonstrates that the prosecutor's peremptory challenges to F.J. and J.S. were racially motivated.

Here, the 59-member venire included four or five African-Americans, representing approximately 6.7 or 8.5 percent of the venire. The prosecutor used 18.2 percent of her challenges (2 of 11) to remove 40 percent (2 of 5) or 50 percent (2 of 4) of the available African-Americans. The prosecutor used two additional challenges against non-African-Americans during selection of the four alternate jurors. Thus, before accepting the panel, the prosecutor exercised a total of 15.4 percent of her challenges (2 of 13) against African-American prospective jurors. One African-American sat on the jury, and one sat as an alternate.[16]

We do not find these numbers suggest improper discrimination. In *People v. Pearson*, *supra*, 56 Cal.4th at page 422, we held the prosecutor's use of one of two peremptory challenges (50 percent) against a group comprising only 12.5 percent of the 24-member panel did not appear " 'suspicious.' " The numbers here

---

[16] Further jury selection proceedings were held prior to commencement of the penalty trial after two alternate jurors were excused, one for medical reasons and the other due to a death in the family. Defendant does not support his claim with statistical evidence from those proceedings nor does he complain about the circumstances under which the prosecutor exercised a peremptory challenge during those proceedings.

are similar and do not cause concern that the challenges were racially motivated. In addition, we observe that the sole African-American on the jury represented 8.3 percent of the jury, approximately the same percentage of African-Americans on the venire.  Further, while not conclusive, the fact that the jury included an African-American "is an indication of good faith [by the prosecutor] in exercising peremptories."  (*People v. Turner* (1994) 8 Cal.4th 137, 168.)

After reviewing the relevant statistics, we are not persuaded that a disproportionate number of African-Americans were excluded from the jury. However, because even a lone race-based challenge is unconstitutional, we bear in mind those statistics while examining the prosecutor's explanation for challenging F.J. and J.S.  (*People v. Jones* (2011) 51 Cal.4th 346, 363.)

### *(2)  The Prosecutor's Explanations*

"A prosecutor asked to explain his conduct must provide a ' "clear and reasonably specific" ' explanation of his "legitimate reasons" for exercising the challenges.' "  (*Lenix*, *supra*, 44 Cal.4th at p. 613, quoting *Batson*, *supra*, 476 U.S. at p. 98, fn. 20.)  "Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection."  (*Lenix*, *supra*, 44 Cal.4th at p. 613.)  A peremptory challenge may be justified by "a neutral explanation related to the particular case to be tried." (*Batson*, *supra*, 476 U.S. at p. 98.)  A peremptory challenge may be based on employment (see e.g., *People v. Johnson* (1989) 47 Cal.3d 1194, 1216, 1220), and " 'hunches[,]' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias" (*People v. Turner*, *supra*, 8 Cal.4th at p. 165).  The basis for a challenge may range from "the virtually certain to the highly speculative" (*Wheeler*, *supra*, 22 Cal.3d at p. 275) and "even a 'trivial'

54

reason, if genuine and neutral, will suffice." (*People v. Arias*, *supra*, 13 Cal.4th at p. 136.)

Citing *Wheeler*, *supra*, 22 Cal.3d at page 276, defendant contends the prosecutor's reasons were not valid because a lack of supervisory experience does not reflect a specific bias against the prosecution, nor does it indicate the juror will be unable to deliberate in the case at hand. While *Wheeler* explained that peremptory challenges are permissible to remove a prospective juror who harbors "a specific bias . . . relating to the particular case on trial or the parties or witnesses thereto," (*Wheeler*, *supra*, 22 Cal.3d at p. 276), it also recognized that "the law allows removal of a biased juror by a challenge for which no reason 'need be given,' i.e., publicly stated: in many instances the party . . . cannot establish his reason by normal methods of proof . . ." (*id*. at p. 275). Therefore, as long as it is exercised in a nondiscriminatory manner, a peremptory challenge may be based on speculation that a prospective juror would be unable to decide penalty because he or she lacked supervisory work experience.

Here, the prosecutor stated she desired jurors who could make difficult decisions such as those in the penalty phase of a death penalty case. It was her belief that this quality is demonstrated by a person who has had practical work experience as a supervisor and that those who did not have this experience were less likely to be able to decide hard questions. The prosecutor further stated that because the prospective jurors' oral responses to the written questionnaire the trial court used during general voir dire provided only limited personal and background information about the prospective jurors, she believed this factor provided relevant and sufficient information to consider in exercising peremptory challenges in this case.

"The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory

challenge, *not* on the objective *reasonableness* of those reasons." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924 [prosecutor's subjective opinion that a customer service representative lacks educational experience to effectively serve as a juror, while "of questionable persuasiveness," could properly form the basis of a peremptory challenge].) Therefore, a prosecutor "can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected." (*Id.* at p. 925.)

If the prosecutor in this case genuinely exercised her peremptory challenges because, in her subjective estimation, neither F.J. nor J. S. had the "high stress" decisionmaking skills required of a capital juror, that explanation constitutes "an entirely valid and nondiscriminatory reason for exercising [those] challenge[s]." (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 924, italics omitted.) Here, the prosecutor asked other non-African-American prospective jurors whether they had supervisory experience, and the defense, apparently sharing the prosecutor's view that supervisory experience was a factor worthy of consideration, sought the same information from several other prospective jurors. We conclude the record substantially supports the trial court's conclusions that the prosecutor's explanations for peremptorily challenging F.J. and J.S. were genuine and not racially motivated.

The dissent makes much of the fact that, in making the *Batson*/*Wheeler* objection, defense counsel asserted that "the two hangs [at the first trial] were black females." Assuming the assertion, not otherwise supported in the record, was accurate, the trial court was aware of it and could take it into account in its ruling. It does not itself show discriminatory intent at the second trial.

*(3)  Comparative Analysis*

Defendant contends a comparative juror analysis of F.J.'s and J.S.'s work experience with that of eight non-African-American jurors whom the prosecutor did not challenge (W.B., L.F., G.M., K.K., B.A., R.P., W.F., M.C.) demonstrates that the prosecutor's justifications for challenging F.J. and J.S. were pretextual. "Comparative juror analysis is evidence that, while subject to inherent limitations, must be considered when reviewing claims of error at [*Batson*/*Wheeler*]'s third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons." (*Lenix*, *supra*, 44 Cal.4th at p. 607.)  "In those circumstances, comparative juror analysis must be performed on appeal even when such an analysis was not conducted below." (*Ibid*.)  "[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Id*. at p. 622.) This is true because "[o]n appellate review, a voir dire answer sits on a page of transcript.  In the trial court, however, advocates and trial judges watch and listen as the answer is delivered.  Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact.  'Even an inflection in the voice can make a difference in the meaning.' " (*Ibid*.)  Moreover, we have recognized "that it is a combination of factors rather than any single one which often leads to the exercise of a peremptory challenge"; that "the particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box"; and that "the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the peremptory challenge and the number of challenges remaining with the other side." (*People v. Johnson*, *supra*, 47 Cal.3d at p. 1220.)  "It is therefore with good reason that we and the United States Supreme Court give great deference to the

57

trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose." (*Id.* at p. 1221.)

"The high court stated:  'It is true that peremptories are often the subjects of instinct, *Batson v. Kentucky*, *supra*, [476 U.S.] at [page] 106 . . . (Marshall, J., concurring), and it can sometimes be hard to say what the reason is.  But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.  If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.'  [Citation.]  The high court cautioned that efforts by a trial or reviewing court to 'substitute' a reason will not satisfy the prosecutor's burden of stating a racially neutral explanation. (*Ibid.*)" (*Lenix*, *supra*, 44 Cal.4th at pp. 624-625.)

Preliminarily, defendant contends that the only criteria to be examined using comparative analysis are the prosecutor's characterizations and the record of actual responses by challenged and unchallenged jurors.  However, "[w]hen asked to engage in comparative juror analysis for the first time on appeal, a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors." (*People v. Jones*, *supra*, 51 Cal.4th at pp. 365-366.)  This is so because a party legitimately may challenge one prospective juror but not another to whom the same particular concern applies. (*Id.* at p. 365.)  "Two panelists might give a similar answer on a given point.  Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable.  These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an

58

exceptionally poor medium to overturn a trial court's factual finding." (*Lenix*, *supra*, 44 Cal.4th at p. 624.)

Before we proceed with our analysis, we address the question whether it is appropriate to consider the oral responses of the non-African-American jurors that were provided after the trial court denied his second motion, that is, the responses of Prospective Jurors B.A., R.P., W.F., and M.C. As we stated in *Lenix*, "appellate review is necessarily circumscribed. . . . [T]he trial court's finding is reviewed on the record as it stands at the time the [*Batson/Wheeler*] ruling is made." (*Lenix*, *supra*, 44 Cal.4th at p. 624.) "If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments." (*Ibid*.) Thus, if defendant believed the trial court should have considered any post-ruling developments, he could have, and should have, renewed his *Batson/Wheeler* claim. Because defendant did not, his reliance on the responses of the above jurors that were provided after the trial court denied his second motion is forfeited. Nonetheless, out of caution, we consider the responses of these prospective jurors in our comparison below.

Juror W.B.

Juror W.B. was a network technician for the Huntington Beach School District, and his responsibilities included computer network administration and computer troubleshooting. He did not supervise anyone in that position, but he had previously worked in sales and office management for an electrical wholesale business. There, he supervised two to three "warehouse-type" employees. Defendant acknowledges this juror's supervisory experience, but asserts it should be accorded little weight because for the five years prior to defendant's trial, the juror held jobs that required increased technical experience and lacked supervisory responsibilities. However, the prosecutor's questions indicate she was concerned

59

with supervisory work experience in general, not that such experience had to be the prospective juror's current or most recent position.

Juror L.F.

Juror L.F. worked as an administrative assistant for Boeing "off and on about 20 years," handling worker's compensation and medical claims and acting as "a buffer between the injured worker and the insurance carrier." Although she made no decisions on the approval or rejection of claims, she consulted with others on those decisions, provided input, and discussed pertinent information with the individual making the ultimate decision. The prosecutor may have reasonably viewed Juror L.F. as someone with experience in making decisions in stressful circumstances, and someone who would work well with other jurors as a team and return a verdict.

Juror G.M.

Juror G.M. was a senior consulting engineer for Tasco Refining. He had never directly supervised people, although he had directed and reviewed the work of engineering contractors. He sometimes worked as part of a team. The prosecutor may have reasonably found Juror G.M. to be more favorable than F.J. and J.S. based solely on his experience in directing and reviewing the work of others, as well as making independent, complex decisions, experience she believed indicated the prospective juror could decide difficult questions.

Juror K.K.

Juror K.K. was a Raytheon lab technician who had worked in the areas of metallurgy and electronic failure analysis for 15 years. He did not supervise employees, but the employees would help each other. Depending on the problem presented, Juror K.K. might receive instructions from engineers or might instruct others. Juror K.K. had obtained an advance degree in financing that was related to his job. The prosecutor may have reasonably found that while Juror K.K. lacked

60

supervisory experience, his ability to receive and give instructions to solve problems on a continuing basis demonstrated a strong ability to make decisions. By contrast, F.J.'s and J.S.'s work experience did not appear to involve these skills.

Juror B.A.

Juror B.A. was a sales representative for Frito-Lay company. Previously, she had been the assistant manager of a high school cafeteria for seven years. Defendant asserts this juror "was never a true supervisor" because she merely was responsible for "seeing that the food was served properly and on time and everybody was doing their duties." The prosecutor had explained she generally was looking for supervisory responsibilities that revealed that a juror could make tough decisions. Juror B.A.'s responses suggested her responsibilities as a cafeteria manager included supervising other employees. Nothing in the description of Prospective Jurors F.J.'s and J.S.'s job responsibilities appears to compare. Significantly, Juror B.A. had been trained in the operation of firearms and owned a variety of firearms. She had shot ".22's, .38's, .45's, [and] nine millimeters," and owed four .22 rifles, a .22 pistol, a nine-millimeter semiautomatic, and a .20-gauge shotgun. The backgrounds of F.J. and J.S. were distinguishable from Juror B.A. by their lack of any supervisory responsibilities, as well as by their lack of experience with guns, a significant factor given the prosecution's reliance on ballistics evidence in this case.

Juror R.P.

Juror R.P. had been a diesel equipment operator for 11 years. Like F.J. and J.S., he did not have supervisory work experience. However, Juror R.P. had had life experiences F.J. and J.S. lacked that suggested he would be a favorable juror for the prosecution. Juror R.P. had previously been a juror in a capital case that involved multiple murder charges and special circumstances allegations, and the

61

jury had reached verdicts in both the guilt and penalty phase. The fact that Juror R.P. had been in the same stressful decisionmaking environment about which the prosecutor was concerned substantially distinguishes him from F.J. and J.S. In addition, Juror R.P. had ties to Long Beach law enforcement: his brother-in-law was the police chief of its airport, his sister was a 911 operator for the Long Beach Police Department, and an acquaintance worked for the police department. The prosecutor could have chosen not to strike Juror R.P. because of those strong ties to law enforcement. (See *People v. Gray* (2005) 37 Cal.4th 168, 190-191 [prosecutor could have chosen not to strike a juror whose husband was a California Highway Patrol Officer, believing the juror would be favorable to the prosecution].) In addition, Juror R.P. had witnessed two separate killings. At the scene of the first, he identified the suspect for police. Juror R.P. had intended to testify in that case and had gone to court, but was not called to the witness stand. He did testify at the vehicle manslaughter trial related to the second killing. These experiences suggest Juror R.P. was not easily intimidated and could make hard decisions. Notwithstanding Juror R.P.'s lack of supervisory experience, the prosecutor could have believed he would have less difficulty deliberating during penalty than either F.J. or J.S.

Juror W.F.

Juror W.F. was an account coordinator for a coupon distribution company, consulting with manufacturers to decide the type of media to use for distribution of coupons. She worked in conjunction with her account manager in making decisions for her clients. Juror W.F. had previously worked for a public relations advertising agency and as a marketing manager for Little Caesar's Pizza. Although she did not have supervisory work experience, her work experience is distinguishable from that of F.J. and J.S. in that it required decisionmaking and working in a team environment. In addition, Juror G.M.'s brother-in-law was a

62

Long Beach police officer whom she saw twice a month. The prosecutor could have believed Juror G.M.'s connection to the Long Beach Police Department, one of the investigating agencies in this case, would have made her a desirable juror for the prosecution.

Juror M.C.

Juror M.C., a widow with nine adult children, had volunteered as a docent at the Torrance courthouse for 13 years. She had previously been a nurse's aide for five years. She had prior jury service in a robbery trial that proceeded to verdict. One of her nephews was retired from the Los Angeles Police Department, and another was an interpreter at the Long Beach courthouse. Although Juror M.C. lacked supervisory experience, the prosecutor could have decided she was a desirable juror for the prosecution who could deliberate effectively based on her experience running a large household, her volunteer docent work in a courthouse for 13 years, her experience on a criminal case that reached a verdict, and her ties to the legal community and law enforcement.

The comparative analysis we have undertaken, whether or not it includes our consideration of the oral responses of the non-African-American jurors that were provided after the trial court denied defendant's second motion, does not undermine our conclusion that substantial evidence supports the trial court's denial of the *Batson/Wheeler* motions as to F.J. and J.S.

> ### 2. *Admissibility of Miller's Statements to Officer Romero, Johnston's Letter to Defendant, and the Still Photographs*

In determining the penalty, the jury takes into account "the circumstances of the crime of which the defendant was convicted in the present [case]." (§ 190.3, factor (a).) Therefore, "evidence of the circumstances of the offense, including evidence creating a lingering doubt as to the defendant's guilt of the offense, is admissible at a penalty retrial as a factor in mitigation under section

190.3." (*People v. Gay* (2008) 42 Cal.4th 1195, 1221.) During the penalty retrial, the prosecution introduced evidence that it had presented at the guilt trial to establish the circumstances of the crimes. Defendant's trial attorney argued that notwithstanding the evidence of defendant's guilt, lingering doubts existed regarding whether the shooting was accidental, whether defendant was the actual shooter, the credibility of Marcia's accomplice testimony, and the credibility of the forensic expert concerning the expended bullets and casings.

Here, defendant contends the trial court at the penalty retrial erred in admitting as circumstances of the crime (1) Miller's statements to Officer Romero, (2) Johnston's letter as an adoptive admission defendant committed "that little robbery in Long Beach," and (3) the still photographs printed at Aerospace. He argues the erroneous admission of this evidence was prejudicial because it permitted the prosecutor to "negat[e] [his] strong mitigating circumstance of lingering doubt and skew[] the jury's weighing process in the direction of death."

"Error in admitting or excluding evidence at the penalty phase of a capital trial is reversible if there is a reasonable possibility it affected the verdict." (*People v. Gay*, *supra*, 42 Cal.4th at p. 1223.) In part II.B.1, above, we found Miller's statements were not testimonial within the meaning of *Crawford*, *supra*, 541 U.S. 32, and that their admission was constitutionally permissible during the guilt trial. For the same reasons, the evidence was properly admitted at the penalty trial under factor (a) of section 190.3.

As discussed above in part II.B.4, above, we conclude Johnston's letter was erroneously admitted during the guilt phase but that the error was harmless. We also conclude the erroneous instruction under CALJIC NO. 2.71.5 for adoptive admissions did not compound the error or violate defendant's constitutional rights. Admission of the letter and instruction during the penalty retrial was error for the reasons expressed above. The information in Johnston's letter, however, was

64

conveyed through Johnston's own testimony, and it did not address defendant's role in the crime. Defendant's attorney argued to the jury that defendant was less culpable because he was not the actual shooter and did not intend to shoot the victim, but Johnston's letter neither accused defendant of intentionally shooting the clerk nor expressed knowledge of how the crimes were carried out. For these reasons, we conclude the error in admitting Johnston's letter had no reasonable possibility of affecting the penalty verdict. (*People v. Pearson*, *supra*, 56 Cal.4th at p. 472.)

Finally, in part II.B.6, above, we concluded the trial court acted within its discretion in admitting the still photographs printed at Aerospace. Here, for the same reasons, the evidence was properly admitted at the penalty retrial under factor (a) of section 190.3.

### 3. Exclusion of Evidence Explaining why Defendant Shot Moon

Defendant contends the trial court erred in excluding Marcia's statement to Detective Edwards during her interview that defendant told her he shot Moon only because Moon had gone for a gun. Defendant claims the evidence was admissible under Evidence Code section 356's rule of completeness because it related to other statements Marcia had made to Edwards that were admitted at trial.

### a. Factual and Procedural Background

On direct examination, Detective Edwards testified Marcia gave him several accounts about when the group met and planned the robbery and what defendant had said during their meetings. On cross-examination, defense counsel asked Edwards whether Marcia told him defendant said he shot the victim because the victim had reached for a gun. The prosecutor objected on hearsay grounds. At a sidebar, counsel argued the statement was admissible under the rule of completeness. The trial court sustained the hearsay objection.

65

### b. Discussion

Evidence Code section 356 provides, in relevant part, that "[w]here part of [a] . . . conversation . . . is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . . when a . . . conversation . . . is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." "The purpose of Evidence Code section 356 is to avoid creating a misleading impression. [Citation.] It applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced. [Citation.] Statements pertaining to other matters may be excluded." (*People v. Samuels* (2005) 36 Cal.4th 96, 130; see *People v. Zapien*, *supra*, 4 Cal.4th at p. 959.)

Here, defendant contends Marcia's statement to Detective Edwards that defendant said he shot the victim because Moon was reaching for a gun was admissible because it bore upon the statements Marcia made to Edwards that had already been admitted. However, at the time of counsel's objection, the relevant portion of the interview that had been elicited through Marcia's testimony related solely to what she perceived during the planning of the robbery and the events leading to and immediately following the crimes. Marcia's statements did not suggest a reason for the shooting or refer to any other statements defendant may have made about the shooting. Nothing about what had been presented to the jury was misleading, and the excluded statement had no bearing on the portion of Marcia's interview that had been introduced into evidence. Accordingly, we conclude the trial court properly excluded Edward's proffered testimony regarding any statements by Marcia that purportedly explained why or how the victim had been shot.

66

## 4. *Victim Impact Evidence*

Defendant contends his penalty judgment must be reversed because the presentation of victim impact evidence, including a photo board displaying 17 photographs of the victim, was unduly prejudicial and rendered his trial fundamentally unfair.

We summarize the relevant victim impact evidence before addressing defendant's claim of prejudice.

Los Angeles Police Officer Stephen Morris was married to victim Richard Moon's stepdaughter Maryann. Morris testified he met Richard Moon in 1986 and described him as the most generous person he ever met, crediting Moon with helping him graduate from the police academy. Morris learned of Moon's death while on duty. He broke down and cried, and his supervisor had to drive him home. Morris felt guilty because he was working blocks from Eddie's when Moon was shot, but he was not there to help. Morris observed that everything had turned "upside-down" for Moon's wife, Catherine, after the murder.

Morris testified Moon loved life more than anyone he knew, and that Moon enjoyed spending time with his family. Morris identified many photographs on the photo board, including some of himself and his family. Some showed Moon with his wife in Hawaii. Others showed Moon with family members celebrating special occasions such as a graduation ceremony, dressed as Santa Claus, playing with children, posing with his granddaughter, and "clowning around." One large photograph in the center of the board showed Moon smiling with his arms outstretched.

Jolene Watson, mother of Moon's grandson Christopher, considered Moon to be a good friend. Watson testified that she, Christopher, and Moon's son Billy were living with Moon and Catherine as a family when Moon was killed. After Watson learned of Moon's death, she informed Billy. Billy gave the news to his

mother, whose reaction "was absolutely horrible." Watson identified a photograph that depicted Moon at Watson's high school graduation.

Catherine's daughter Maryann was Moon's stepdaughter, but Moon treated Maryann like his own child. Maryann described the moment she learned of Moon's death as the most painful thing that ever happened to her. She added, "[t]here's just a big gap in our lives." She described her mother as very lonely and empty, and having "lost the sparkle in her eye."

"In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825-827.) Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180.)

Defendant contends section 1191.1[17] limits the prosecution to a single victim impact witness at the penalty phase. The issue is forfeited because defendant failed to object on this ground in the trial court. (See *People v. Kelly* (2007) 42 Cal.4th 763, 793 [failure to object to particular victim impact testimony

---

[17] In relevant part, section 1191.1 reads as follows: "[T]he next of kin of the victim if the victim has died[ ] have the right to attend all sentencing proceedings under this chapter . . . . [¶] The victim, or up to two of the victim's parents or guardians if the victim is a minor, or the next of kin of the victim if the victim has died, have the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express his, her, or their views concerning the crime, the person responsible, and the need for restitution. The court in imposing sentence shall consider the statements of victims, parents or guardians, and next of kin made pursuant to this section and shall state on the record its conclusion concerning whether the person would pose a threat to public safety if granted probation."

forfeits issue on appeal]; Evid. Code, § 353, subd. (a).)  Even if the issue were preserved, it would fail on its merits because "a trial court has the discretionary power under section 1191.1 to hear witnesses who are not strictly victims." (*People v. Brown* (2003) 31 Cal.4th 518, 573, fn. 24; see *People v. Zamudio* (2008) 43 Cal.4th 327, 364-365 [victim impact evidence not limited to testimony of a single witness]; *People v. Pollock*, *supra*, 32 Cal.4th at p. 1183 [victim impact evidence not limited to testimony of family members].)  Defendant provides no persuasive reason to reconsider our prior decisions.

Next, defendant contends the trial court erroneously admitted victim impact evidence that was far more extensive and prejudicial than the evidence held admissible in *Payne v. Tennessee*.  To the contrary, the testimony of Morris, Watson, and Maryann was limited to explain the nature of their relationship with the victim, the immediate effects of the murder, and the residual and continuing impact of the murder on their lives.  (*People v. Brown*, *supra*, 33 Cal.4th at p. 398; see *People v. Ervine* (2009) 47 Cal.4th 745, 792 [victim impact evidence may include the murder's effect on friends, coworkers, and the community].)  Admission of Watson's testimony regarding the close relationship the victim had with his son Billy and the emotional impact of the victim's death on his grandson Christopher was not improper, even though neither of those family members testified.  "There is no requirement that family members confine their testimony about the impact of the victim's death to themselves, omitting mention of other family members." (*People v. Panah* (2005) 35 Cal.4th 395, 495.)  We also conclude the number of witnesses was not excessive.  (See *People v. Taylor* (2010) 48 Cal.4th 574, 646 [proper to admit victim impact testimony of six family members representing four generations of victim's close family].)

Defendant next contends admission of the prosecution's photo board was unduly prejudicial and rendered his trial fundamentally unfair.

Photographic evidence of the victim while alive is relevant and admissible as "it portrays the victim as seen by the defendant before the murder." (*People v. Anderson* (2001) 25 Cal.4th 543, 594.) Here, there was nothing particularly inflammatory about the photographs that might have unfairly influenced the jurors. The prosecutor properly used them to convey that, as Morris, Watson, and Maryann had described, Moon had celebrated and enjoyed life to the fullest.

Defendant objected at trial that one particular photograph was inadmissible because it depicted Moon in a "Jesus Christ[-like] pose," and was used as "nothing but a sympathy ploy." The photograph depicts Moon by the water looking up while standing with his arms outstretched. That pose and others on the board that depict Moon with his arms outstretched were in keeping with Morris's description of Moon as one who outwardly expressed his joy for life. Although the challenged photograph was centered on the photo board and larger than the other photographs, the prosecutor placed no special emphasis on the challenged photograph nor did he attribute any religious significance to it. We conclude the challenged photograph was properly admitted as part of the photo board.

Defendant contends the prejudicial effect of the photographs was established by the jury's request to view the photo board during the course of its one-day penalty phase deliberations. Although the request was denied, defendant argues "the request itself lays bare the raw emotion present in the jury room and the prejudicial effect" of the photographs on display.

The record does not support the claim of prejudice. In refusing the jury's request to view the photographs during deliberations, the trial court limited the extent to which the photographs could emotionally affect the jurors, and defendant cites nothing in the record that suggests the photographs were so inflammatory that they prevented the jurors from making a rational penalty determination. Evidence presented at the penalty phase need not be devoid of emotional content.

(*People v. Lopez* (2013) 56 Cal.4th 1028, 1078.) "The photographs admitted here, and the prosecutor's use of them in argument, assisted the jury in evaluating the consequences of defendant's crimes and they were not the type of 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response.' " (*People v. Thomas*, *supra*, 53 Cal.4th at p. 825.)

Defendant next contends that during rebuttal the prosecutor improperly asked the jury to base its penalty decision on a comparison of the virtues of the victim and defendant, by arguing, "I'm asking you to consider everything. But view Calvin Chism in the context of what he has done in his lifetime, and compare it to those circumstances in aggravation that have been offered to you for your consideration. Then reach an appropriate and truthful verdict." The prosecutor properly asked the jurors to "consider everything" and "compare" defendant's conduct throughout his life in light of all the aggravating evidence in deciding penalty. There was no misconduct.

### 5. *Defendant's Proposed Jury Instructions*

Defendant claims the trial court erred in refusing to give certain special instructions requested by the defense. He contends their absence deprived him of federal and state constitutional rights to present a defense, to a fair and reliable capital trial, and to due process of law.

Defendant's proposed jury instruction No. 52.16 stated: "The mitigating circumstances that I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence in this case. You should pay careful attention to each of those factors. Anyone of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this

71

case. But you should not limit your consideration of mitigating circumstances to these specific factors. [¶] You may also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty. [¶] A mitigating circumstance does not have to be proved beyond a reasonable doubt to exist. You must find that a mitigating circumstance exists if there is any substantial evidence to support it. [¶] Any mitigating circumstance presented to you may outweigh all the aggravating factors. You are permitted to use mercy, sympathy, or sentiment in deciding what weight to give each mitigating factor."

The trial court properly rejected this instruction. Pursuant to CALJIC No. 8.85, the court instructed the jury it could consider, take into account, and be guided by, among other things, "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." We have consistently held this instruction "adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy." (*People v. Burney* (2009) 47 Cal.4th 203, 261.)

Defendant's proposed jury instruction No. 52.25 stated: "There is no requirement that all jurors unanimously agree on any matter offered in mitigation. Each juror must make an individual evaluation of each fact or circumstance offered in mitigation. Each juror must make his own individual assessment of the weight to be given such evidence. Each juror should weigh and consider such matters regardless of whether or not they are accepted by other jurors."

We have held the trial court is "not required to instruct [the jury] that unanimity is not required before a juror may consider evidence to be mitigating."

72

(*People v. Coddington* (2000) 23 Cal.4th 529, 641.)  In addition, "CALJIC No. 8.88 adequately advises jurors on the scope of their discretion to reject death and to return a verdict of life without possibility of parole."  (*People v. McKinnon* (2011) 52 Cal.4th 610, 696.)[18]  The trial court did not err in refusing the proposed instruction.

Defendant's proposed jury instruction No. 52.26 stated:  "The aggravating factors that I have just listed for you may be considered by you, if applicable, and established by the evidence, in determining the penalty you will impose in this case.  These factors that I have listed are the only ones that you may find to be aggravating factors and you cannot take into account any other facts or circumstances as a basis for imposing the penalty of death on the defendant."

Here, "[t]he court gave the standard sentencing instruction (see CALJIC No. 8.85), and we have held  that instruction is proper despite its failure expressly

---

[18]    The trial court instructed the jury under CALJIC No. 8.88, in pertinent part, as follows:  "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶]  An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.  [¶]  A mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶]  The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignments of weights to any of them.  [¶]  You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.  [¶] In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.  [¶] To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

to limit aggravating evidence to the enumerated statutory factors, and to exclude nonstatutory factors as a basis for the death penalty. [Citation.]" (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180.) The trial court properly refused to instruct the jury with proposed jury instruction No. 52.26.

Defendant's proposed jury instruction No. 52.32 stated: "The law of California does not require that you ever vote to impose the penalty of death. After considering all of the evidence in the case and the instructions given to you by the court, it is entirely up to you to determine whether you are convinced that the death penalty is the appropriate punishment under all of the circumstances of the case."

The proposed instruction was duplicative of CALJIC Nos. 8.84[19] and 8.88. "CALJIC No. 8.84 informed the jurors in this case that state law required that a defendant found guilty of a special circumstance murder be punished by death or confinement in prison for life without the possibility of parole and that 'you must now determine *which of these penalties* shall now be imposed on the defendant.' (Italics added.) CALJIC No. 8.88 further advised the jurors that 'you determine under the relevant evidence *which penalty is justified and appropriate*.' " (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 694.) There is no requirement that the trial court must instruct the jury, pursuant to CALJIC No. 8.88, that "death must be the appropriate penalty, not just a warranted penalty." (*People v. Moon* (2005) 37

---

[19]    Pursuant to CALJIC No. 8.84, the trial court instructed the jury that "[t]he defendant in this case has been found guilty of murder of the first degree. The allegation [that the] murder was committed under a special circumstance has been specially found to be true. It is the law of this state that the penalty for a defendant found guilty of murder in the first degree shall be death, or a confinement in the state prison for life without the possibility of parole, in any case in which the special circumstance alleged in this case has been specially found to be true. Under the law of this state, you must now determine which of these penalties shall be imposed on the defendant."

Cal.4th 1, 43.) The trial court properly rejected defendant's request to give proposed jury instruction No. 52.32.

The defense also asked the trial court to give proposed jury instructions Nos. 52.36, 52.39, and 52.39.1. Those proposed instructions would have told the jurors that "you must assume that the penalty that each of you chooses will in fact be carried out" (No. 52.36), "[l]ife without the possibility of parole means exactly what it says the defendant will be imprisoned for the rest of his life" (No. 52.39), and " you must assume that a sentence of death means that the defendant will suffer the ultimate penalty and be executed." However, "because of the 'possibility of appellate reversal or gubernatorial commutation or pardon, it would be inaccurate and therefore erroneous to instruct the jury that if it returns a death verdict, the sentence of death *will* inexorably be carried out. [Citations.]' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1091.) "[W]e have consistently held that the phrase 'life without possibility of parole' as it appears in CALJIC No. 8.84 adequately informs the jury that a defendant sentenced to life imprisonment without possibility of parole is ineligible for parole. [Citations.] We also have held that the United States Supreme Court decisions in *Kelly v. South Carolina* (2002) 534 U.S. 246, *Shafer v. South Carolina* (2001) 532 U.S. 36, and *Simmons v. South Carolina* (1994) 512 U.S. 154, do nothing to alter that conclusion." (*Ibid.*) The trial court properly denied defendant's request to instruct the jury under defendant's proposed jury instructions Nos. 52.36, 52.39, and 52.39.1.

Defendant's proposed jury instruction No. 52.38 stated: "Evidence has been introduced in this case that may arouse in you a natural sympathy for the victim or the victim's family. [¶] You must not allow such evidence to divert your attention from your proper role in deciding the appropriate punishment in this

75

case. [¶] You may not impose the penalty of death as a result of an irrational, purely emotional response to this evidence."

In *People v. Zamudio*, *supra*, 43 Cal.4th 327, we listed several reasons why the trial court properly refused to give a similar instruction proposed by the defense. Those reasons apply here as well. "First, the substance of the requested instruction, insofar as it correctly stated the law, was adequately covered by the slightly modified version of CALJIC 8.84.1 the trial court gave;[20] '[t]he proposed instruction would not have provided the jury with any information it had not otherwise learned from CALJIC No. 8.84.1 . . . .' [Citation.] Second, the requested instruction is misleading to the extent it indicates that emotions may play no part in a juror's decision to opt for the death penalty. Although jurors must never be influenced by passion or prejudice, at the penalty phase, they 'may properly consider in aggravation, as a circumstance of the crime, the impact of a capital defendant's crimes on the victim's family, and in so doing [they] *may exercise sympathy for the defendant's murder victims and . . . their bereaved family members*. [Citation.]' [Citation.] 'Because the proposed instruction was misleading . . . , and because the point was adequately covered by the instructions that the court did give, the trial court acted correctly in refusing to use' the instruction defendant proposed. [Citation.]" (*People v. Zamudio*, *supra*, 43 Cal.4th at pp. 368-369, fn. omitted.) The trial court properly rejected defendant's request that it instruct the jury with proposed jury instruction No. 52.38.

We conclude the trial court properly refused defendant's proposed instructions.

---

**20** The court instructed with CALJIC No. 8.84.1, which, as relevant here, told the jurors "[y]ou must neither be influenced by bias, nor prejudice against the defendant, nor be swayed by public opinion or public feelings. Both the People and the defendant have a right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict."

76

### 6. *Cumulative Error*

Defendant contends the cumulative effect of the asserted penalty phase errors requires reversal of his convictions and death sentence even if none of the errors individually compels reversal. We conclude any errors or assumed errors were not prejudicial, whether viewed separately or cumulatively.

### 7. *Attempted Robbery Felony-murder Special-circumstance Allegation*

Defendant was found death-eligible based on the jury's true finding on the attempted robbery felony-murder special-circumstance allegation. He contends imposition of his death sentence violates international law and the Eighth Amendment's proportionality requirement, in the absence of a finding that he intended to kill the victim or exhibited reckless indifference to life as a major participant in the robbery. These claims have no merit.

"The felony-based special circumstances do not require that the defendant intend to kill. It is sufficient if the defendant is the actual killer or either intends to kill or 'with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission' of the felony. [Citations.]" (*People v. Rountree*, *supra*, 56 Cal.4th at p. 854; see *People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 194 [rejecting argument that under *Hopkins v. Reeves* (1998) 524 U.S. 88, 99, the state must prove the actual killer had a culpable mental state].)

Imposition of the death penalty absent a finding of a culpable mental state for an actual killer does not violate international law because international law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. (See *People v. Watkins* (2012) 55 Cal.4th 999, 1034; *People v. Taylor*, *supra*, 48 Cal.4th at p. 661.)

We decline defendant's request to reconsider these prior holdings.

### 8. Challenges to California's Death Penalty Law

Defendant raises numerous challenges to California's death penalty law under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We have consistently rejected each claim, and defendant offers no persuasive reason to reconsider our prior decisions.

"Section 190.2 is not impermissibly broad in violation of the Eighth Amendment." (*People v. Loker* (2008) 44 Cal.4th 691, 755.) "The sentencing factor of 'circumstances of the crime' (§ 190.3, factor (a)) is not unconstitutionally vague and does not result in the arbitrary and capricious imposition of the death penalty." (*People v. Valencia* (2008) 43 Cal.4th 268, 310.)

"The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. [Citations.] The death penalty statute is not unconstitutional for failing to provide the jury with instructions of the burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination." (*People v. Morrison* (2004) 34 Cal.4th 698, 730–731.)

"Including in the list of potential mitigating factors adjectives such as 'extreme' (§ 190.3, factors (d), (g)) and 'substantial' (*id*. factor (g)) does not erect an impermissible barrier to the jury's consideration of mitigating evidence." (*People v. Valdez, supra*, 55 Cal.4th at p. 180.) "Intercase proportionality review is not required. [Citation.] Use of prior criminal activity in aggravation was proper. The court need not instruct the jury that statutory mitigating factors are relevant solely in mitigation. [Citation.] The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants

differently.  [Citation.]  Use of the death penalty does not violate international law and is not unconstitutional."  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1180.)

### 9.  *Defendant's Prior Juvenile Adjudication for Assault with a Firearm*

After a court trial held prior to sentencing, defendant was found to have suffered a prior serious or violent felony conviction for purposes of sentence enhancement under the Three Strikes law.  The trial court's finding was based on defendant's juvenile adjudication for assault with a firearm (§ 245, subd. (b)) for his involvement in the Arnold Park incident.  Applying the second strike provision of the Three Strikes Law, the court doubled defendant's sentence for the Riteway robbery.  (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

Relying on *Apprendi v. New Jersey* (2000) 530 U.S. 466, defendant contends the trial court improperly doubled his sentence for his conviction of the Riteway robbery in violation of his federal constitutional because prior juvenile adjudications are not proved to a jury beyond a reasonable doubt.

After defendant filed his opening brief, we decided in *People v. Nguyen* (2009) 46 Cal.4th 1007, 1028, that "the absence of a constitutional or statutory right to jury trial under the juvenile law does not, under *Apprendi*, preclude the use of a prior juvenile adjudication of criminal misconduct to enhance the maximum sentence for a subsequent adult felony offense by the same person."  We decline defendant's request to reconsider that decision.

### 10.  *Imposition of Upper Terms on Counts Two and Three and the Firearm Enhancements on Counts One and Three*

Citing *Cunningham v. California* (2007) 549 U.S. 270, defendant contends the trial court violated his Sixth Amendment right to a jury trial by erroneously sentencing him to upper terms for attempted robbery (count two) and second degree robbery (count three) and for the firearm enhancements imposed (former

§ 12022.5, subd. (a)(1)) as to counts one (first degree murder) and three[21] based on facts neither found by a jury beyond a reasonable doubt nor admitted by defendant.

In imposing upper terms for counts two and three and the firearm enhancements as to counts one and three, the trial court said "the factors in aggravation greatly outweigh those in mitigation" and specifically found as follows: (1) all of the crimes involved great violence, the threat of great bodily injury, viciousness, and callousness; (2) both victims were particularly vulnerable given they were alone and unarmed; (3) defendant was in a position of leadership and induced Johnson to participate in the attempted robbery; (4) the manner in which the crimes were carried out reflected planning, sophistication, and professionalism; defendant "ha[d] an entourage that he . . . recruit[ed] to commit the robberies;" before defendant entered the store, he sent someone inside to look for clerks and cameras; (5) a firearm was used in each robbery; (6) defendant engaged in violent conduct indicating a threat to society; and (7) defendant had recently been paroled.

"*Apprendi v. New Jersey* (2000) 530 U.S. 466, holds that, under the Sixth Amendment, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' [Citation.] In *Blakely v. Washington* (2004) 542 U.S. 296, the high court extended the scope of *Apprendi* by defining 'statutory maximum' as the 'maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.' [Citations.] Applying *Blakely*, the court later held in *Cunningham v. California*, *supra*, 549 U.S. 270, that California's determinate sentencing law did not comport with a defendant's Sixth

---

[21] The trial court stayed defendant's sentence on count two.

Amendment jury trial right.  As *Cunningham* explained, 'If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.' (*Cunningham*, at p. 290.)  Because the aggravating circumstances necessary for imposition of an upper term 'depend on facts found discretely and solely by the judge' (*id*. at p. 288), the 'statutory maximum' prescribed in California's sentencing scheme is not the upper term but rather the middle term (*ibid*.)."  (*People v. Myles* (2012) 53 Cal.4th 1181, 1220.)

In *People v. Black* (2007) 41 Cal.4th 799 (*Black*), we explained that "the imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (*Id*. at p. 816.)  This exception "include[s] not only the fact that a prior conviction occurred, but also other related issues that may be determined by examining the records of the prior convictions." (*Id*. at p. 819.)  For example, the trial court's finding that the defendant's prior convictions were " 'numerous or of increasing seriousness' " falls within this exception for a defendant's recidivism.  (*Id*. at pp. 818-819; see *id*., p. 820.)  "The determinations whether a defendant has suffered prior convictions, and whether those convictions are 'numerous or of increasing seriousness' (Cal. Rules of Court, rule 4.421(b)(2)), require consideration of only the number, dates, and offenses of the prior convictions alleged.  The relative seriousness of these alleged convictions may be determined simply by reference to the range of punishment provided by statute for each offense.  This type of determination is 'quite different from the resolution of the issues submitted to a jury, and is one more typically and appropriately undertaken by a court.' " (*Id*. at pp. 819-820.)

In *People v. Towne* (2008) 44 Cal.4th 63, 80-81, we held that imposition of an upper term based on the trial court's finding that the defendant was on probation or parole at the time the offense was committed did not violate the defendant's Sixth Amendment right to a jury trial under *Cunningham*. Similarly, in this case the trial court's reliance on its finding that defendant had recently been paroled to impose the upper terms on counts two and three and the firearm enhancements imposed under former section 12022.5, subdivision (a)(1), on counts one and three, was permissible under *Cunningham*. (See *People v. Moberly* (2009) 176 Cal.App.4th 1191, 1198 ["the dual use of a fact or facts to aggravate both a base term and the sentence on an enhancement is not prohibited"]; *People v. Price* (1984) 151 Cal.App.3d 803, 812 & fn. 5 ["a trial court may use the same fact(s) to impose more than one aggravated term provided the fact is reasonably related to the particular count" and "the fact has not already been or will not be used to impose either an enhancement or a consecutive term"].) Accordingly, defendant was not deprived of his Sixth Amendment right to a jury trial under *Cunningham*.

### 11. Conduct Credits

At sentencing, the trial court awarded defendant 643 days of custody credits. Defendant contends the trial court erroneously relied on section 2933.2 to deny him any presentence conduct credits.

Subdivision (a) of section 2933.2 prohibits any person convicted of murder from accruing any presentence conduct or work time credit. However, the statute applies only to offenses committed after its effective date of June 3, 1998. (§ 2933.2, subd. (d), as approved by voters (Prop. 222) June 2, 1998; see *People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1317). Because defendant committed his crimes on June 12, 1997, any good time or work time credits are governed by

section former section 4019, which provided that a defendant convicted of a crime enumerated in section 667.5 will receive one day of conduct credit for each six-day period of confinement during which he complies with the rules and regulations of the facility. (Former § 4019, subds. (a)(1), (c), (f), as amended by Stats. 1982, ch. 1234, § 7, p. 4553.) Under section 2933.1, subdivision (c), however, "the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." Subdivision (a) of that statute, which imposes a limitation on the number of work time credits that may be awarded (an issue not relevant here), applies to "any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5." (§ 2933.1, subd. (a).)

Defendant's convictions for murder and attempted robbery are listed under section 667.5, subdivision (c)(1) (murder) and (9) (robbery) and thus he is a person specified in subdivision (a) of section 2933.1. Therefore, the combined total of defendant's presentence conduct credits awarded under former section 4019 may not exceed 15 percent of his actual period of confinement. (§ 2933.1, subd. (c); *People v. Palacios* (1997) 56 Cal.App.4th 252, 258.) Accordingly, defendant is entitled to 96 days of conduct credit (15 percent of 643 presentence days of confinement). (Former § 4019, subds. (a)(1), (c), (f).)

## III. DISPOSITION

Defendant is entitled to 96 days of conduct credit under former section 4019, subdivisions (a)(1), (c), (f).  The superior court is directed to modify the abstract of judgment to reflect that defendant is entitled to 96 days of conduct credit.  (§ 2933.1, subdivision (c).)  In all other respects, including the verdict of death, the judgment is affirmed.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**

I join the majority in upholding defendant's convictions for murder, robbery, and attempted robbery, as well as his death sentence. But I disagree with the majority's rejection of defendant's claim that the trial court erred when it applied the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) to double his five-year sentence for robbery. (See maj. opn., *ante*, at p. 79.)

Defendant argues that because his prior "strike" was an adjudication in juvenile court, as to which he had no right to trial by jury, the federal Constitution's Sixth Amendment right to a jury trial barred the trial court from using the prior juvenile adjudication to double his sentence for robbery. The majority disagrees, relying on this court's previous rejection of a similar claim in *People v. Nguyen* (2009) 46 Cal.4th 1007 (*Nguyen*).

I dissented in *Nguyen*. As my dissent explained, "the Sixth Amendment's right to a jury trial does not permit a trial court to impose additional punishment that is based on prior juvenile conduct for which there was no right to a jury trial." (*Nguyen*, *supra*, 46 Cal.4th at p. 1034 (dis. opn. of Kennard, J.).) Thus, the trial court here erred in using defendant's prior juvenile adjudication to double defendant's sentence for robbery. Therefore, I would direct the clerk of the superior court to modify the judgment by dismissing defendant's prior "strike" and by reducing his robbery sentence to an undoubled term of five years.

KENNARD, J.*

---

\* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

Defendant Calvin Chism, a black man, was sentenced to death for the murder of Richard Moon, a white store clerk. At the first penalty phase, the jury hung 10-2 in favor of death. It is undisputed that the two holdouts were black women. In selecting the second penalty-phase jury, the prosecutor exercised peremptory strikes against the first two black jurors available for challenge. When defendant challenged both strikes as racially motivated (see *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*)), the prosecutor gave reasons for each strike. The trial court denied defendant's motions, and this court now upholds the trial court's rulings.

Today's opinion marks the second time in 12 months that this court has rejected a claim of improper discrimination in jury selection despite indications in the record that the strike of a black female juror was substantially motivated by discriminatory intent. (See *People v. Williams* (2013) 56 Cal.4th 630, 698 (dis. opn. of Werdegar, J.) ["as to at least two African-American women called as prospective jurors, the prosecutor engaged in purposeful discrimination in exercising his challenges"]; *id.* at p. 718 (dis. opn. of Liu, J.) [same].)

Prospective Juror J.S., the second black juror struck by the prosecutor, was a telephone circuit designer who worked her way up from a clerk position over a 30-year career at Pacific Bell. For the past 20 years, she had trained others on how to design circuits. She had two adult children as well as a 12-year-old. She had

previously served on a jury in a criminal case and in a civil case, both of which reached a verdict. At voir dire, she said she would be willing to vote for either death or life without parole, and that her decision would depend on the evidence. She said she would be willing to express her views and would be open to listening to others. She repeatedly said she would be willing to vote for the death penalty in an appropriate case.

In striking this juror, the prosecutor gave two reasons related to decisionmaking ability: (1) lack of supervisory experience in the workplace and (2) lack of experience handling stressful situations in life. The record reveals no support for the second reason, and the trial court refused a defense request to reopen voir dire specifically to examine whether J.S. had dealt with stressful situations in her life. As to the first reason, the record does not support the prosecutor's characterization of J.S.'s position at Pacific Bell, and at least three seated white jurors had no supervisory role in their current jobs. Considering all relevant circumstances in the record before us, I find it difficult to conclude that the prosecutor's strike of J.S. was not motivated in substantial part by improper discrimination. Accordingly, I dissent from that aspect of today's decision.

## I.

In *Snyder v. Louisiana* (2008) 552 U.S. 472 (*Snyder*), the high court made clear that " '[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose[.]' " (*Id.* at p. 478.) *Snyder*, a capital case, focused on the strike of a single black juror, Jeffrey Brooks, whom the prosecutor described (1) as having a " 'nervous' " demeanor and (2) as possibly prone to convict the defendant of a lesser crime, thus avoiding a penalty phase, in order " 'to go home quickly' " and fulfill his obligations as a student teacher. (*Ibid.*) The high court refused to credit the first reason because "the record [did] not show that the trial

judge actually made a determination concerning Mr. Brooks' demeanor." (*Id.* at p. 479.)

As to the second reason, *Snyder* concluded that it "fails even under the highly deferential standard" applicable on habeas review. (*Snyder*, *supra*, 552 U.S. at p. 479; see *id.* at p. 478 [applying " 'clear error' " standard].) The high court said the possibility that Mr. Brooks would vote to convict on a lesser offense in order to end the case quickly was "highly speculative." (*Id.* at p. 482.) Further, the court found the strike "suspicious" because "the prosecutor anticipated on the record during *voir dire*" that the trial would be brief, because "Mr. Brooks' dean promised to 'work with' Mr. Brooks to see that he was able to make up any student-teaching time that he missed due to jury service," and because "the trial occurred relatively early in the fall semester," thus giving Mr. Brooks "many weeks" to make up any lost teaching time. (*Id.* at pp. 482–483.) Finally, the court said "[t]he implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks'." (*Id.* at p. 483; see *id.* at p. 484 [comparing Mr. Brooks to two white jurors with "urgent" or "more pressing" work or family obligations].) In light of these circumstances, *Snyder* concluded that the prosecutor's strike of Mr. Brooks was "motivated in substantial part by discriminatory intent." (*Id.* at p. 485.)

As explained below, the prosecutor's strike of J.S. in this case is no less suspicious than the strike of Mr. Brooks in *Snyder*.

### A.

During voir dire on March 5, 2001, Prospective Juror J.S. introduced herself as a telephone circuit designer for Pacific Bell. She had graduated from high school and attended two years of college, studying business administration. While in school, she did clerical work at the Los Angeles County "Department of

Justice" or "District Attorney's Office." At the time of voir dire, she had worked for Pacific Bell for 30 years, initially as "a clerk for awhile, and then I moved on up." When asked whether she "ever supervised any employees," J.S. said, "No. I do a lot of training." J.S. proceeded to explain that for about 20 years, she had been training others on how to design circuits on a computer.

J.S. had previously served on a jury in a criminal trial and in a civil trial. In both instances, the jury reached a verdict. The criminal case concerned child molestation, and the civil case involved personal injuries. J.S. was divorced; her former husband was a plumber. She had two adult sons and a 12-year-old son, as well as three grandchildren.

On March 2, 2001, the court had asked J.S. about her views on the death penalty. J.S. said she would neither automatically vote for death nor automatically vote against death. When the court asked for her "general views on the death penalty," J.S. said, "I would have to hear the evidence." The court then asked, "So if you heard the evidence, and you were instructed on the law, if you were convinced that death was the appropriate penalty, you could vote for that?" J.S. replied, "Yes." The court also asked, "If you were convinced that life without parole was appropriate, could you vote for that?" J.S. replied, "Yes."

On March 5, 2001, in response to questions from the prosecutor, J.S. said she understood she would have to weigh each piece of evidence, to decide whether it was aggravating or mitigating, and to choose the appropriate penalty. At that point, the prosecutor asked, "With all that in mind, and understanding that before you're asked to exercise your choice you will be presented evidence, do you feel that you would always choose life over death?" J.S. replied, "No." The prosecutor then asked, "Do you feel the other way, that you would always choose death over life?" J.S. said, "No." The voir dire continued: "[Prosecutor]: At this juncture, are you prepared, if in your mind you think death is an appropriate

4

penalty, to come back with a verdict of death?  [¶] [J.S.]:  Yes.  [¶] [Prosecutor]: You understand that's what would be required if you think death is appropriate? [¶] [J.S.]:  Yes.  [¶] [Prosecutor]:  You can do that?  [¶] [J.S.]:  Yes."

J.S. then gave the following answers to questions from defense counsel and the court:  "[Defense counsel]:  . . . [Y]ou can assure us that you will express your views and listen to others, right?  [¶] [J.S.]:  Yes. . . .  [¶] [Defense counsel]:  In other words, if you have an opinion and the a [*sic*] majority disagrees with you, you will state your opinion?  [¶] You won't be a shrinking violet?  [¶] [J.S.]:  No. [¶] The Court:  You are not going to change your mind to accommodate some other people, are you?  [¶] [J.S.]:  No.  [¶] [Defense counsel]:  By the same token, if you listen to them, you do believe that you might be right — you will be open to listening to them?  [¶] [J.S.]:  Yes.  [¶] [Defense counsel]:  And you understand that the final ultimate decision on your vote is your measuring stick, your opinion? [¶] [J.S.]:  Yes.  [¶] [Defense counsel]:  Both sides are entitled to that, correct?  [¶] [J.S.]:  Yes."

The prosecutor exercised her fourth peremptory challenge against F.J., the first black juror available for challenge, and the trial court denied defendant's *Batson* motion.  On March 6, 2001, after the parties exercised additional strikes, the prosecutor struck J.S., who was the second black juror available for challenge. Defense counsel again objected.  At sidebar, defense counsel observed that J.S. "seemed like an idea [*sic*] juror.  She had two priors, both — one civil, one criminal.  There was a verdict.  She has worked for many, many, many years at Pacific Bell.  Worked her way up.  She supervised people.  She trains.  She obviously can make decisions.  She worked — and just otherwise seems to be a good juror.  [¶] I can't see any reason why the district attorney would not accept her, other than the fact she is a black female.  [¶] And I would note that the last

5

jury which hung, the two hangs were black females. But that should not be a basis."

The court responded: "Of course, [the prosecutor] has relied on life's experience criteria in the past. [¶] . . . . [¶] This juror has trained people. I don't recall that she supervised anybody. I believe she has trained people on how to use the computer design circuits."

The prosecutor responded: "My recollection is that she specifically said she did not supervise anybody. [¶] From what I can glean from her job assignment is she's got a very fancy, but misleading, job description, which she is basically, from my understanding, she is into data entry. She makes no decisions. She is given specifications and she inputs that information into a computer. She is basically a more sophisticated form of a filing clerk. And, basically, she's held nothing but clerk positions. She has trained individuals in terms of inputting data. She is a data entry specialist, basically.

"I don't think the fact she trains people in how they input data makes her specifically qualified for high-stress decision-making jobs. And that's basically what this is. This is going to be a very stressful, deliberative process. It also requires individuals who are seasoned decision makers. They could handle the stress of a tough decision. [¶] . . . .

"I've looked at her job description. She has basically been in clerk positions. If I were to not kick her, it seems to me that it would only be because she is an African American. And I don't believe that I'm going to discriminate in one direction or the other. I'm not going to keep her simply because she is African American. I have confidence in the fact that good people with experience can be fair to an African American male.

"I don't think that it is essential that an African American sit on the jury. I think it would be wonderful if we can find individuals who I feel are seasoned

6

decision makers who can handle the stress of the situation. But there's absolutely nothing about her background that tells me that she can operate in a high-stress situation. And that's very important in this type of case where the issue is life and death. It's going to be extremely stressful."

At that point, the trial court said: "The D.A.'s comments have been non-solicited. I asked a prima facie showing, that prima facie showing has not been made." Defense counsel disputed the prosecutor's characterization of J.S.'s work experience and explained that J.S.'s long work history, experience as a trainer, and middle age ("she is at least in her 50s, probably older") would make her a good juror. The court said, "Her position in the Department of Justice was filing," and then added, "And I don't necessary [*sic*] agree or disagree with the criteria that the D.A. is using as far as whether I would if I were a D.A., but that's a non-race based criteria. And her use of the peremptory as to this juror was consistent with that non-suspect category use."

After further argument by defense counsel, the prosecutor said, "But I want to add that it's not just supervisory positions that I look for. I look for how they handled stressful situations or incidences in their life." Defense counsel then asked, "May I inquire, this Juror was asked whether or not she has ever had to deal with stress in her life, specifically?" The court responded, "I don't recall that specific question. But there were questions about her life." At that point, defense counsel said, "There would be a request to reopen general voir dire on behalf of Mr. Chism so we can explore that possibility with [J.S.]." The prosecutor objected and, without disputing that J.S. had not been asked about stressful life experiences, said, "How a person deals with stress and how they recognize it as stress will vary from individual to individual. I know what I go on; their ability to deal with stress is one of the things I look at, including their ability to make decisions." Without

7

further analysis, the court said, "The voir dire was appropriately conducted. The request is denied."

The only other identified black woman on the panel, M.G., was excused for cause because she said she would never impose the death penalty. In the end, the jury that made the penalty decision consisted of 11 white jurors and one black man, A.D., who was a former correctional officer and current correctional counselor with the federal Bureau of Prisons. A.D. had served on three juries, all of which reached a verdict. During his voir dire, the court said, "And I take it if there is a disturbance in the institution, it's a stressful situation," and asked whether A.D. "deal[t] with stress every day in [his] life." A.D. answered in the affirmative. A.D. also noted that he was the union president, that he had had law enforcement and weapons training, and that he had friends in most law enforcement agencies.

**B.**

Although the trial court found no prima facie case of discrimination in denying defendant's *Batson* motion with respect to J.S., today's opinion properly concludes that "the trial court ruled ultimately that the prosecutor's stated reasons were genuine and race neutral, and therefore . . . the question whether defendant made a prima facie showing of racial discrimination is rendered moot." (Maj. opn., *ante*, at p. 52.) The question before us is whether an examination of "all of the circumstances" bearing on the prosecutor's strike of J.S. reveals purposeful discrimination. (*Snyder*, *supra*, 552 U.S. at p. 478.) For several reasons, I believe it does.

First, the prosecutor struck J.S., a black juror, in a capital penalty trial where the defendant was a black man convicted of murdering a white victim. We have noted the obvious relevance of this racial dynamic, as has the high court. (See *People v. Taylor* (2010) 48 Cal.4th 574, 608 [" '[A]dequate inquiry into

8

possible racial bias is . . . essential in a case in which an African-American defendant is charged with commission of a capital crime against a White victim.' (*People v. Holt* (1997) 15 Cal.4th 619, 660; see also *Mu'Min v. Virginia* (1991) 500 U.S. 415, 424 . . . .)"]; *People v. Wheeler*, *supra*, 22 Cal.3d at p. 281 ["[T]he defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention."]; *Powers v. Ohio* (1991) 499 U.S. 400, 416 (*Powers*) ["Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred."].)

Second, in objecting to the prosecutor's strike of J.S., defense counsel observed that the first penalty-phase jury hung because two black female jurors refused to vote for death. On appeal, defendant quoted this observation in his briefing and mentioned it repeatedly at oral argument. The accuracy of the observation was never disputed by the prosecutor, the trial court, or the Attorney General on appeal. Moreover, neither the prosecutor, the trial court, nor the Attorney General ever disputed the prosecutor's awareness that the two holdouts were black women. Plainly, the uncontested observation that two black female jurors refused to vote for death in the first penalty trial heightens the possibility that improper discrimination informed the prosecutor's strike of J.S., the only death-qualified black woman on the panel.

Third, although today's opinion says "the fact that the jury included an African-American 'is an indication of good faith [by the prosecutor] in exercising peremptories' " (maj. opn., *ante*, at p. 54), I am doubtful that much can be inferred

9

from the prosecutor's failure to strike seated Juror A.D., a correctional counselor with strong professional and personal ties to law enforcement. Given A.D.'s background, it would have been odd and clearly suspicious for the prosecutor to strike A.D.

Fourth, and most importantly, a review of the record casts doubt on the prosecutor's stated reasons for striking J.S. In explaining the strike, the prosecutor took the view that a capital sentencing proceeding "requires individuals who are seasoned decision makers." The prosecutor said that in selecting "individuals who I feel are seasoned decision makers who can handle the stress of the situation," she considered two indicators: (1) "supervisory positions" in employment and (2) "how they handled stressful situations or incidences in their life." According to the prosecutor, these were the criteria that motivated her to strike J.S. These reasons thus comprise the sole focus of our review. (See *Miller-El v. Dretke* (2005) 545 U.S. 231, 252 (*Miller-El*) ["[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."].)

As to the first criterion, it is true that J.S. said during voir dire that she had not supervised any employees. The prosecutor was entitled to rely on this criterion as long as she applied it evenhandedly to all jurors, regardless of race. However, at least two white jurors, L.F. and K.K., who were already empaneled at the time the prosecutor struck J.S., also had no supervisory experience, and a third seated white juror, W.B., had no supervisory role in his current job and only a minor supervisory role in a previous job.

10

L.F. was an administrative assistant at Boeing who handled worker's compensation and medical claims. During voir dire, the prosecutor asked L.F. about her job, as follows:

"[The prosecutor]: You make decisions as to whether or not claims will be approved or rejected?

"[L.F.]: No, ma'am.

"[The prosecutor]: What is [*sic*] your job duties with respect to that?

"[L.F.]: I'm a buffer between the injured worker and the insurance carrier. I do a lot of problem solving to eliminate that.

"[The prosecutor]: Your [*sic*] a facilitator?

"[L.F.]: Yes, uh-huh.

"[The prosecutor]: How long have you been engaged in that particular job assignment?

"[L.F.]: Probably off and on about 20 years at Boeing.

. . . .

"[The prosecutor]: Do you work with other individuals on your job?

"[L.F.]: Yes.

"[The prosecutor]: Can you tell me about that?

"[L.F.]: We have workers' comp and the leave of absence are in the same area. And so there is cross-training. [¶] I have no decision making in what I do, but I can consult, of course, with other people on decisions to be made."

"[The prosecutor]: Okay. [¶] So if a problem arises that requires a decision, are you responsible for bringing it to somebody else's attention?

"[L.F.]: Yes.

"[The prosecutor]: Do you also discuss pertinent information with that individual who would make the ultimate decision?

"[L.F.]: Sometimes.

11

"[The prosecutor]:  Do you have some input?

"[L.F.]:  Yes.

"[The prosecutor]:  Apart from that, you basically facilitate the making of the claim and the processing of the claim?

"[L.F.]:  Yes."

K.K. was a lab technician at Raytheon, a position he had held for 15 years. The prosecutor asked K.K., "What specifically do you do?"  K.K. replied, "Metallurgy and electronic failure analysis."  K.K. said he had an advanced degree in finance.  When the prosecutor asked whether he "ever had to supervise employees," K.K. said, "Basically, we're self-helping each other.  [¶] . . . .  [¶] A lot of the people that we work with, some of it's on-the-job training, some of it's working directly with engineers that give us instructions, so it depends on who needs help."  When the prosecutor asked whether he had held any other jobs, K.K. said, "Not since I've completed school, but I've been auto mechanic, house painter, whole bunch of different types of jobs I guess."

A third seated white juror, W.B., was a network technician for Huntington Beach High School District.  When the prosecutor asked him to describe his job, W.B. said, "It means computer system, computer network administration, computer troubleshooting."  When the prosecutor asked whether he supervised any employees, W.B. replied, "No.  I do not."  W.B. went on to say that five years earlier, he "was in electrical wholesale, in sales and office management, that type of thing."  The prosecutor asked whether he supervised any employees while working in office management, and W.B. said, "Yes.  Warehouse-type people."  The prosecutor then asked, "And what's the maximum number of employees you supervised?"  W.B. replied, "We had two, three, just sometimes temporaries."

To the extent that the prosecutor looked for supervisory experience as a proxy for seasoned decisionmaking ability, a comparison of J.S. with L.F. is

12

"particularly striking." (*Snyder, supra*, 552 U.S. at p. 483.) As an administrative assistant handling worker's compensation and medical claims, L.F. served as a "buffer" and a "facilitator." She facilitated the making and processing of claims, and she brought problems, information, and input to others responsible for making decisions. But she said, "I have no decision making in what I do . . . ." In addition, K.K., while having more advanced education than J.S., likewise had no supervisory role in his job as a lab technician. Further, W.B. had no supervisory role in his job as a network technician. The only supervisory experience W.B. mentioned was a job in office management five years earlier, in which he supervised two or three "[w]arehouse-type people" who were "sometimes temporaries." In sum, nothing in the record indicates that J.S.'s job as a telephone circuit designer was less suggestive of seasoned decisionmaking ability than L.F.'s job as an administrative assistant, K.K.'s job as a lab technician, or W.B.'s job as a network technician or his prior job in office management. (See *Miller-El, supra*, 545 U.S. at p. 241 ["If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ."].)

Today's opinion speculates that "[t]he prosecutor may have reasonably viewed Juror L.F. as someone with experience in making decisions in stressful circumstances, and someone who would work well with other jurors as a team and return a verdict," and that "[t]he prosecutor may have reasonably found that . . . [K.K.'s] ability to receive and give instructions to solve problems on a continuing basis demonstrated a strong ability to make decisions." (Maj. opn., *ante*, at pp. 60–61.) But the record nowhere suggests that L.F. worked "in stressful circumstances." Moreover, why wouldn't it have been equally reasonable for the prosecutor to infer from J.S.'s work experience that J.S., like K.K., was engaged in problem solving on a continuing basis and, like L.F, would work well with others?

13

J.S. appeared to be a valued employee at Pacific Bell, having been promoted over a 30-year career from a clerk position to training others on how to design telephone circuits. From J.S.'s job description, there was every reason for the prosecutor to infer that J.S. was experienced in problem solving and worked well with others.

Indeed, the prosecutor's strike of J.S. after having accepted L.F., K.K., and W.B. appears even more suspicious in light of the prosecutor's characterization of J.S.'s job. The prosecutor described J.S. as "a data entry specialist" who "makes no decisions" and "is given specifications and . . . inputs that information into a computer. She is basically a more sophisticated form of a filing clerk. And basically, she's held nothing but clerk positions." This minimization of J.S.'s work history is unsupported by the record. J.S. worked as a clerk while she was in school and began working as a clerk for Pacific Bell, but eventually moved up to her current role. Regarding the process of designing circuits, J.S. said, "We get an order, and then we have to put together the circuit, where it's going from and where it ends up at." J.S. never mentioned data entry, and the prosecutor did not ask whether J.S.'s job involved decisionmaking, problem solving, or technical expertise. As with L.F., K.K., and W.B., the prosecutor did not ask J.S. whether her job involved stressful situations. When defense counsel noted that the prosecutor's characterization of J.S.'s work experience was unsupported by J.S.'s testimony, the trial court did not address the discrepancy. The court observed that J.S.'s "position in the Department of Justice was filing" but did not consider J.S.'s job as a circuit designer who trained others at Pacific Bell, a position she had held for 20 years.

As noted, the prosecutor gave a second reason in explaining her strike of J.S.: ". . . I want to add that it's not just supervisory positions that I look for. I look for how they handled stressful situations or incidences in their life." But this

14

reason does not dispel the inference of discrimination because, as defense counsel objected at trial and as the record makes clear, J.S. was never asked about stressful situations in her life. The trial court said, "I don't recall that specific question. But there were questions about her life." The only questions asked about J.S.'s life, apart from her work history, concerned the makeup of her family and what activities she engaged in on a regular basis, to which J.S. said, "I take my son, my 12-year-old son, back and forth to basketball practice and his games and — [¶] . . . . [¶] . . . . I don't have time to do anything else." Defense counsel asked the trial court to reopen voir dire specifically to examine whether J.S. had dealt with stressful situations in her life. But the prosecutor objected, and the trial court denied the request. Moreover, the prosecutor's second reason could not have distinguished L.F., K.K., or W.B. from J.S. because nothing in the record addressed whether or how those jurors had dealt with stressful situations in their lives.

To sum up: The prosecutor struck J.S., a black woman, in selecting the jury for a capital penalty trial involving a black man convicted of murdering a white victim. It is undisputed that the first penalty-phase jury hung with two black women as holdouts against a death verdict. Based on J.S.'s work experience, the prosecutor said J.S. was not a "seasoned decision maker[]" who "could handle the stress of a tough decision." But J.S.'s work experience does not appear meaningfully different, as a proxy for decisionmaking ability, from the work experience of three seated white jurors, including an administrative assistant who said, "I have no decision making in what I do . . . ." Further, although the prosecutor said she also "look[s] for how they handled stressful situations or incidences in their life," this additional reason could not have explained the strike of J.S. because J.S. was never asked about stressful situations in her life. Considering the totality of relevant circumstances, I find it more likely than not

15

that the prosecutor's reasons for striking J.S. were pretextual. "The prosecution's proffer of th[ese] pretextual explanation[s] naturally gives rise to an inference of discriminatory intent." (*Snyder*, *supra*, 552 U.S. at p. 485.)

### III.

In reaching a contrary conclusion, today's opinion reveals several dubious aspects of our *Batson* jurisprudence.

First, the court's examination of defendant's *Batson* claim, including its cursory comparative juror analysis, accords deference to the trial court's ruling. (Maj. opn., *ante*, at pp. 52, 57–59.) But nothing in the record indicates that the trial court, in making its ruling, compared J.S. to white jurors whom the prosecutor did not strike. The trial court also did not examine discrepancies between J.S.'s testimony and the prosecutor's account of J.S.'s job. Nor did the trial court reopen voir dire in light of the prosecutor's claim that J.S. had not dealt with stressful situations in her life, even though the court acknowledged that J.S. had not been asked that question. Although deference is appropriate when the trial court has made " 'a sincere and reasoned effort to evaluate' " all relevant circumstances bearing on a *Batson* claim (*People v. Lenix* (2008) 44 Cal.4th 602, 614 (*Lenix*)), it is unclear what exactly this court is deferring to here. (See *People v. Mai* (2013) 57 Cal.4th 986, 1062 (conc. opn. of Liu, J.).) On this record, the case for deference is especially weak because the prosecutor did not rely on J.S.'s demeanor or other intangible qualities apparent only to the trial court. This court, no less than the trial court, is capable of evaluating the prosecutor's claims as to decisionmaking ability, as demonstrated by each juror's employment or life experience.

Second, the court casts doubt on the utility of comparative juror analysis when conducted for the first time on appeal because "a party legitimately may challenge one prospective juror but not another to whom the same particular

16

concern applies. [Citation.] 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. . . .' [Citation.]" (Maj. opn., *ante*, at p. 59.) Whatever the merits of this concern (cf. *Miller-El*, *supra*, 545 U.S. at p. 247, fn. 6 [rejecting "a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects"]), it has no applicability here. That is because the prosecutor emphasized that the capital sentencing process, in her view, "*requires individuals who are seasoned decision makers.*" (Italics added.) In other words, the prosecutor's reason for striking J.S. was a necessary quality she purportedly sought in any seated juror, whatever other qualities a juror might have. A comparative analysis that focuses specifically on this quality is thus probative of purposeful discrimination. (The court does not posit other qualities that distinguish L.F., K.K., or W.B. from J.S. in any event.) Moreover, the utility of such analysis does not require a large number of comparison jurors. In *Snyder*, the high court found it highly probative to compare a black juror struck by the prosecutor to just two seated white jurors. (*Snyder*, *supra*, 552 U.S. at pp. 483–484.) Here, as in *Snyder*, comparative juror analysis gives rise to a strong inference of discriminatory intent, even on a deferential standard of review. (*Id.* at p. 485; see *Miller-El*, *supra*, 545 U.S. at p. 241 [finding comparative juror analysis "[m]ore powerful" than the fact that the prosecution struck 10 out of 11 black venirepersons].)

Third, the court says "[t]he basis for a challenge may range from 'the virtually certain to the highly speculative' [citation] and 'even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.]" (Maj. opn., *ante*, at pp. 54–55.) But *Snyder* identified the "highly speculative" nature of the prosecutor's stated reason as an indication of implausibility, giving rise to an inference of

17

discriminatory intent.  (*Snyder*, *supra*, 552 U.S. at p. 482.)  Further, the court says the *Batson* inquiry focuses " 'on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons.' "  (Maj. opn., *ante*, at pp. 55–56.)  But we have also recognized that the prosecutor's credibility can be measured by, among other factors, " 'how reasonable, or how improbable, the explanations are.' "  (*Lenix*, *supra*, 44 Cal.4th at p. 613, quoting *Miller–El v. Cockrell* (2003) 537 U.S. 322, 339.)  Quite often, as in this case, an objective analysis of the reasonableness of the prosecutor's explanation in light of the relevant circumstances in the record is the only basis for meaningful review of a *Batson* ruling.

Finally, today's opinion makes new law that improperly limits comparative juror analysis.  In this appeal, defendant contends that the prosecutor's stated reasons for striking two black jurors are undermined by a comparison of those jurors not only to nonblack jurors already seated at the time the trial court ruled on the strikes, but also to nonblack jurors seated *after* the trial court's rulings.  The court holds that "if defendant believed the trial court should have considered any post-ruling developments, he could have, and should have, renewed his *Batson/Wheeler* claim.  Because defendant did not, his reliance on the responses of the above jurors that were provided after the trial court denied his second motion is forfeited."  (Maj. opn.*, ante*, at p. 59.)  This rule, the court says, follows from our statement in *Lenix* that "the trial court's finding is reviewed on the record as it stands at the time the *Wheeler/Batson* ruling is made.  If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments."  (*Lenix*, *supra*, 44 Cal.4th at p. 624.)

But this statement in *Lenix* was dictum because *Lenix* involved no issue of "subsequent developments" urged for appellate consideration.  The forfeiture rule

18

announced today is in substantial tension with *Lenix*'s key *holding* with regard to consideration of comparative juror analysis when it is urged for the first time on appeal.  In light of the obvious importance that *Snyder* and *Miller-El* assigned to comparative juror analysis, *Lenix* said that those cases "stand for the proposition that, as to claims of error at *Wheeler*/*Batson*'s third stage, our former practice of declining to engage in comparative juror analysis for the first time on appeal unduly restricts review based on the entire record.  As the high court noted in *Snyder*, 'In *Miller-El v. Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, *all* of the circumstances that bear upon the issue of racial animosity *must* be consulted.' (*Snyder*, [*supra*, 552 U.S.] at p. 478, italics added.)  Thus, evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons." (*Lenix*, *supra*, 44 Cal.4th at p. 622, fn. omitted.)

*Lenix* thus holds that in reviewing a *Batson* ruling, an appellate court is not precluded from considering, and indeed must consider, grounds that the defendant did not bring to the trial court's attention.  The essential premise of this holding is that appellate review of a *Batson* ruling is not merely an exercise in evaluating the trial court's performance based on arguments put forth by the parties.  Instead, as *Lenix* said, *Snyder* and *Miller-El* require appellate courts to consider *all* relevant circumstances — to engage in "review based on the entire record" — in determining whether the strike of a particular juror was improperly motivated. (*Lenix*, *supra*, 44 Cal.4th at p. 622.)  If jurors seated before a trial court's ruling, but never brought to the court's attention, must be considered in comparative juror analysis, then there is no reason why jurors seated after a trial court's ruling may be considered only if the defendant makes a renewed objection.  Any juror

19

accepted by the prosecutor is a potentially relevant basis for comparison in determining whether a particular strike was discriminatory.

Although I agree that comparing the struck jurors to jurors seated after the trial court's ruling does not aid the *Batson* claim in this case (maj. opn., *ante*, at pp. 61–63), this is not always so. In *People v. Manibusan* (2013) 58 Cal.4th 40, the prosecution exercised its first peremptory strike against a black female juror whose only prior service on a jury had resulted in a hung jury. Among the reasons offered for the strike, the prosecutor said, "I have an absolute policy of getting rid of people whose only jury experience resulted in a hung jury." (*Id.* at p. 108 (conc. opn. of Liu, J.).) But after the trial court denied the defendant's *Batson* motion, the prosecutor repeatedly accepted two jurors whose sole experience on a jury had resulted in a hung jury. "The prosecutor's 'absolute policy,' it turns out, was not absolute at all." (*Ibid.*) Today's decision requires us to ignore such obviously relevant circumstances in evaluating a *Batson* claim.

As a practical matter, the court has put the bar on notice that any reasonably competent defense attorney must reassert all *Batson* challenges at the end of jury selection, even though counsel need not bring any comparative juror analysis to the trial court's attention in order to preserve the entire record for appeal. (See *Lenix*, *supra*, 44 Cal.4th at p. 622 ["evidence of comparative juror analysis must be considered . . . even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons"].) The peculiarity of this result should be a tip-off that something is amiss. Under *Snyder*, *Miller-El*, and *Lenix*, our duty to consider all relevant circumstances in evaluating a *Batson* claim does not depend on counsel's compliance with such an empty exercise.

**IV.**

Today's decision extends this court's extraordinary track record of denying *Batson* claims. (See *People v. Harris* (2013) 57 Cal.4th 804, 885, 892–898 (conc.

20

opn. of Liu, J.) [documenting this court's rejection of *Batson* claims in 101 out of 102 cases presenting the issue over the past two decades, with *People v. Silva* (2001) 25 Cal.4th 345 (*Silva*) as the sole exception].)  Our *Batson* jurisprudence — especially its reflexive deference to trial court rulings and its refusal to infer discrimination from disparate treatment of similarly situated jurors — leaves one to wonder whether any circumstances, short of an outright admission by the prosecutor (see *Silva*, at p. 375), will ever suffice to prove a violation.

Prospective Juror J.S. was a mother of three who advanced over a 30-year career into a technical job in which she trained others.  She had twice served on a jury that reached a verdict.  She repeatedly said she would consider the evidence, would speak her mind and listen to others, and would be willing to vote for the death penalty in an appropriate case.  J.S. appeared to be a well-qualified juror, no less qualified than several white jurors whom the prosecutor accepted.  In this penalty retrial of a black man convicted of murdering a white victim, in which it is undisputed that the first penalty-phase jury hung with two black women refusing to vote for death, the prosecutor's strike of J.S. was not credibly explained by the reasons the prosecutor gave.  Under the laws of this state, defendant may well deserve the death penalty in the eyes of a reasonable jury.  But the jury must be one selected free of improper discrimination.

I join the portion of the court's opinion affirming defendant's convictions. But I respectfully dissent from the court's affirmance of the penalty verdict.

LIU, J.

21

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Chism

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S101984
**Date Filed:** May 5, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Richard R. Romero

_____

**Counsel:**

Mark D. Lenenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark D. Lenenberg
P.O. Box 940327
Simi Valley, CA  93094-0327
(805) 526-5988

Zee Rodriguez
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 576-1342